*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/28/2016

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                           *
  MARY ROSE REDDY, et al.,                 *
                    Plaintiffs,            *  14-cv-299-JL
                                           *  February 16, 2016
                 v.                        *  2:10 p.m.
                                           *
  NEW HAMPSHIRE ATTORNEY GENERAL,          *
  et al.,                                  *
                    Defendants.            *
                                           *
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

## TRANSCRIPT OF MOTION HEARING
### BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

| | |
|---|---|
| For the Plaintiffs: | Michael J. Tierney, Esq.<br>Wadleigh, Starr & Peters, PLLC |
| | Matthew S. Bowman, Esq.<br>Alliance Defending Freedom |
| For NH Attorney General: | Elizabeth A. Lahey, Esq.<br>NH Attorney General's Office |
| For Municipalities: | Garry Lane, Esq.<br>Ransmeier & Spellman |
| For Town of Greenland: | Samantha Dowd Elliott, Esq.<br>Gallagher, Callahan & Gartrell |
| For City of Manchester: | Peter Chiesa, Esq.<br>Solicitor's Office |
| Court Reporter: | Sandra L. Bailey, LCR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, NH 03301<br>(603) 225-1454 |

BEFORE THE COURT

1

2 THE CLERK:  The Court has before it for

3 consideration today a motion hearing in Reddy, et al.

4 versus New Hampshire Attorney General, et al., civil

5 case 14-cv-299-JL.

6 THE COURT:  Good afternoon, everybody.  Why

7 don't you identify yourselves for the record and then

8 we'll get started.

9 MS. LAHEY:  Elizabeth Lahey for the Attorney

10 General.

11 MS. ELLIOTT:  Samantha Elliott for the town of

12 Greenland.

13 MR. CHIESA:  Peter Chiesa, city of Manchester.

14 MR. LANE:  Garry Lane for all the municipal

15 and county defendants other than Manchester and

16 Greenland.

17 THE COURT:  Right.  You've got the city of

18 Concord plus all the counties.

19 MR. TIERNEY:  Michael Tierney for the

20 plaintiffs.

21 MR. BOWMAN:  And Matthew Bowman for the

22 plaintiffs.

23 THE COURT:  All right.  Thank you, everyone.

24 All right, we're here on the constitutional challenge to

25 the buffer zone statute which has been pending for a

1    while now, but we're here on motion to dismiss.  Who

2    will be taking the lead, I assume the AG?

3              MS. LAHEY:  The AG's Office.

4              THE COURT:  It's your motion, so why don't you

5    proceed.

6              MS. LAHEY:  Under United States Supreme Court

7    precedent this case does not present a ripe justiciable

8    case or controversy.  All the parties agree that the

9    correct test in this case is whether there's a credible

10   threat of enforcement.  Here there's no such threat

11   because RSA 132:38 does not prescribe any conduct until

12   a facility creates a zone.  Thus until a zone is created

13   there is nothing that could be enforced against the

14   plaintiffs.

15             The statute at issue here is not the same as

16   the statute in Massachusetts.  The Massachusetts statute

17   creates a mandatory fixed-size zone.  The statute at

18   issue here created the option for facilities to

19   establish narrowly-tailored zones to fit the specific

20   needs at each specific zone.  And that distinction by

21   the statutes is created by the up to language.  And the

22   statute provides that no person shall knowingly enter or

23   remain on a public way or sidewalk adjacent to a

24   reproductive health care facility within a radius up to

25   25 feet.  And so no prohibition can exist until a

1   facility gives meaning to the term up to 25 feet.  And

2   they do this as prescribed by the statute -- or as laid

3   out in the statute, I'm sorry, by assessing the needs of

4   their particular facility, getting city approval for the

5   plan and demarcating the zone and hanging up a sign.

6   And that's all outlined in the statute.

7           THE COURT:  Well, but there's nothing, I mean,

8   conceivably that could happen in 30 minutes, right?  I

9   mean, for all we know the consultations have happened,

10  the signs have been made, they're ready to go, they're

11  in the lobby but they haven't been hung.  I'm not

12  suggesting there's any evidence of this by the way, I'm

13  just asking you.  When you say narrowly tailored, I

14  mean, conceivably tomorrow there could be a sign on

15  every facility, a demarcated zone of 25-foot radius, and

16  there would be nothing in the statute to prevent that as

17  long as consultation, demarcation and signage had

18  happened, right?

19          MS. LAHEY:  I am not sure I understand the

20  question, but conceivability wouldn't confer standing.

21  So while that hypothetical could take place, those are

22  not the facts that are before this Court.  They haven't

23  been alleged.  So it wouldn't relate to the standing

24  analysis.

25          THE COURT:  Well, I think it does, so, why

1  don't you answer my question.

2          MS. LAHEY:  Can you ask it again.

3          THE COURT:  The question is, you said it is

4  narrowly tailored.

5          MS. LAHEY:  Sure.

6          THE COURT:  And that the procedures are

7  prescribed by statute.  And they are, I agree with you.

8  I mean, there's got to be consultation with law

9  enforcement and I guess land use, signage, right?

10  That's got to happen.  There's got to be demarcation of

11  the zone.

12          MS. LAHEY:  Correct.

13          THE COURT:  And there's got to be signage.

14          MS. LAHEY:  Ah-hum.

15          THE COURT:  My only point is that there's

16  nothing in the statute to prescribe what considerations

17  must be undertaken, you know, I mean, everybody could

18  decide on 25 if they wanted to, there's nothing to

19  prevent it from being 25 everywhere literally overnight.

20          MS. LAHEY:  Well, there is a limitation in

21  that when you read the statute in whole, when you look

22  at the statement of findings and the purpose, it

23  requires a balancing between the needs of the facility

24  and the First Amendment.  And so that does constrain

25  what facilities can do.  They're required by statute and

1  by legislative statement to consider the First Amendment

2  rights of other individuals and weighing those against

3  the need for ingress and egress to those facilities.

4          THE COURT:  Just give me a moment.

5          MS. LAHEY:  Sure.  If you're looking -- it was

6  exhibit --

7          THE COURT:  I'm just looking at the statute.

8          MS. LAHEY:  Yeah, it's at the beginning.  It's

9  in the statement of findings purpose.  Down in section

10  three it talks about weighing the rights.

11          THE COURT:  All right.  Actually, I'm really

12  sorry, the statement of findings, is that in the RSA or

13  is that in the public laws?

14          MS. LAHEY:  No, it's in the public laws.  And

15  I think I miscited it in my motion.  So it's in the

16  public laws.  I have a copy of it if the Court --

17          THE COURT:  I have that too.  I have that too.

18  But that's not part of the statute.

19          MS. LAHEY:  But it's part of what the

20  legislature passed, so it is -- it's not housed with the

21  statute.

22          THE COURT:  There's nothing that creates a

23  duty, there's nothing that charges -- that might be the

24  purpose of the statute, that might be legislative intent

25  and everybody's hope, but there's nothing in the statute

1    that requires the facility -- by the way, we're off on a

2    tangent already and it's my fault, I interrupted,

3    because we're not talking about the constitutional

4    statute yet.  But I'm just trying to ask, there's

5    nothing in the statute that requires the facilities or

6    the municipalities or anyone to undertake any specific

7    considerations.  Literally they could have a 30-second

8    conversation where they say I think 25 feet would be

9    good and everybody says, yeah, it's a good idea, and

10   they demark it.  I mean, there's nothing in the statute

11   to prohibit that.

12          MS. LAHEY:  I think that's correct, if you

13   don't look at the findings and --

14          THE COURT:  Well, who would look at the

15   findings?  What lawyer would, I mean, there's nothing,

16   what lawyer would advise a client to undertake

17   considerations that aren't required by law?  They're not

18   required by law.  They appear to be findings that led to

19   this legislation but they're not part of the statute.  I

20   mean, that's just a fact, right?

21          MS. LAHEY:  Okay.  Okay.

22          THE COURT:  Is that a yes?  You say okay, I

23   mean, is that like a dismissive okay or is that you

24   agree?

25          MS. LAHEY:  No, no.

1          THE COURT:  There's nothing in the statute

2     that requires anything except consultation, demarcation

3     and signage.

4          MS. LAHEY:  Correct, there's nothing in, yeah,

5     RSA 132.

6          THE COURT:  And the number of feet involved,

7     while you're correct, and I think it's important by the

8     way, I agree, while the distance could be something much

9     less than 25, the fact is in every case it could be 25.

10          MS. LAHEY:  That's correct.

11          THE COURT:  All right.  Go ahead.  I

12     interrupted you.  You were explaining how the statute's

13     different than the Massachusetts statute.

14          MS. LAHEY:  Sure.  And so that's the language

15     of the statute.  To the extent that the Court finds that

16     that language is ambiguous, go into the legislative

17     history.  The legislative history supports the state's

18     interpretation of the statute, and that's for three

19     reasons.  First, the up to language was not in the

20     original version of the statute.  It was expressly

21     added.  And so the plaintiffs' interpretation would read

22     out that expressly added language, and that would be

23     improper under the canons of statutory interpretation.

24     The legislature specifically chose to add that language,

25     therefore the statute needs to be interpreted to give

1  meaning to that statute which is what the Attorney

2  General's interpretation does.

3          And second, looking at the majority report,

4  that also lays out that this statute does not create a

5  fixed mandatory zone, and it talks about --

6          THE COURT:  I think you're right about that.

7  I will say that, you know, I haven't heard oral argument

8  yet from the plaintiff, but based on what I've read I

9  think your interpretation of the statute is more

10 plausible.  That doesn't mean I rule you out.  I just --

11 you don't have to persuade me on that.

12         MS. LAHEY:  Okay.  So, given that the statute

13 doesn't create, or it gives the option to create a zone

14 other than mandating a zone, nothing is prohibited under

15 the statute until a facility creates a zone, and so the

16 fact that no facility has done that to date eliminates

17 the possibility that there's standing here.  And I just

18 want to note that law enforcement and the Attorney

19 General, because nothing had been created, their ability

20 to enforce anything under the statute is conditioned on

21 creation.  So, they can't enforce what hasn't been

22 created, so that's really the end of the analysis.  If

23 the Court is persuaded by our interpretation of the

24 statute, then there's nothing that's been created,

25 there's nothing to enforce, therefore it follows that

1   there's no threat, there can be no threat of

2   enforcement.

3           Moving away from our standing argument, I just

4   wanted to briefly address four arguments raised by the

5   plaintiffs.  And the first is their reference to New

6   Hampshire Right to Life pact and First Unitarian and

7   their argument that those cases are dispositive of the

8   issues before this Court, and that position is incorrect

9   because those cases involve state actions that

10  prohibited conduct on the face of the statute.  And so

11  in New Hampshire Right to Life it dealt with a statute

12  that limited campaign expenditures.  There was no

13  precondition to that limitation.  Once the statute was

14  on the books, the state had the authority to enforce

15  that statute.  That's different than here where there's

16  no enforcement mechanism until there's been creation.

17          And the same is true under First Unitarian.

18  That dealt with an easement that prohibited expressive

19  conduct.

20          THE COURT:  Let me dispense of one issue,

21  then, based on that argument.  I don't think it's going

22  to be a controversy, but I should ask.

23          The idea that there can be no enforcement

24  without establishment of zones, can I assume, then, that

25  the other statutes like loitering, that law enforcement

1   is disavowing any sort of intent to enforce other

2   statutes within the yet to be created zone areas?

3           MS. LAHEY:  I don't think so.  So I think if

4   there was somebody harassing people or loitering outside

5   of a Planned Parenthood location and Planned Parenthood

6   called and asked law enforcement to come down and it

7   was, you know, right in front of the entrance, I would

8   anticipate law enforcement, I'm not speaking for law

9   enforcement, but I would imagine that that would be

10  enforced, but that is separate from, nothing would be

11  enforced pursuant to this statute.  It would be pursuant

12  to some other statute that's already on the books or

13  another section of the criminal code that's already on

14  the books.

15          THE COURT:  Right.  But what about something

16  like loitering, right, that didn't involve harassment,

17  because harassment is a great example but it doesn't

18  really involve --

19          MS. LAHEY:  Yeah, I'm not familiar with the

20  loitering RSA, so I don't know if you have to post

21  loitering.  I know I've seen signs around that say no

22  loitering.  I'm not sure if that's a prerequisite.  If

23  that were the case, then the answer would be no unless

24  there's a no loitering sign posted.  But if there is

25  some other statute that required a posting or

1    demarcating and it's an otherwise valid unchallenged

2    statute, I think that the expectation would be that law

3    enforcement would enforce it, and that is what is

4    contemplated under McCullen, that those are the types of

5    things that these facilities would do prior to creating

6    a facility, is work with the existing laws on the books

7    to create a remedy that allows access to the facilities.

8              THE COURT:  Okay.

9              MS. LAHEY:  So, I touched on New Hampshire

10   Right to Life.  First Unitarian, it's the same thing.

11   That case involved a deed with an easement and the deed

12   on its face prohibited certain conduct, and so in that

13   case, with a bit of a caveat, is that the deed delegated

14   the ability to enforce to the private landowner, but

15   that's not what this case is.  This case is it creates,

16   there's no prohibition on its face, so nobody can

17   enforce it, where in that case there was a prohibition

18   and the landowner could enforce it should somebody

19   violate that.

20             So, the difference between this case and New

21   Hampshire Right to Life and First Unitarian is that

22   there is an existing prohibition on misconduct that

23   doesn't exist here, and it doesn't exist here because

24   nobody's created a facility.  And instead, this case is

25   really akin to Clapper which is a 2013 United States

1    Supreme Court case, and I have a quote that I --

2            THE COURT:  Nobody briefed their argument in

3    Clapper which was interesting.  I mean, if you're going

4    to be briefing it, by the way, just so you know.

5            MS. LAHEY:  Okay.

6            THE COURT:  Because I looked, I don't mean

7    this disrespectfully, but I view it as a pretty

8    significant oversight on everybody's part.  But go

9    ahead.

10           MS. LAHEY:  Okay, so, to touch on it I think

11   --

12           THE COURT:  I'm glad to hear you're going to

13   argue it though.  Go ahead.

14           MS. LAHEY:  Okay.  So, in Clapper the court

15   held that the plaintiffs can only speculate as to

16   whether the government would seek to use the statute

17   instead of one of the other, now I'm paraphrasing, but

18   one of the other options available to it, and that the

19   court said, it expressed that it was reluctant to

20   endorse standing theories that required guesswork as how

21   to challenge the decisionmaker -- I'm sorry, how the

22   decisionmakers will exercise their judgment.

23           THE COURT:  Yeah.

24           MR. LAHEY:  And so that case is in a national

25   security context.  Clapper, and for this proposition,

1   has been cited for the First Circuit in Blum.

2           THE COURT:   Blum.

3           MS. LAHEY:   Yeah, recently, and so in a non-

4   national security context.  So I think this case is on

5   point with Clapper in that all the legislature has done

6   is created an option for these facilities and so it's

7   not the court's role to guess whether a facility will

8   ultimately use that option or whether, and not use one

9   of the other options available.  And so I think Clapper

10  is guiding on that point.

11          The second argument is that the facilities

12  have immediate plans to create zones.  First, that

13  ventures into summary judgment territory because it's

14  attached a lot of other documents and testimony that

15  wasn't included in the complaint.  I think that's

16  improper on motion to dismiss, nor do I think the Court

17  really needs to get into that.  But second, the record

18  establishes that the way that that testimony was

19  presented in the plaintiffs' papers is not correct, and

20  so we would rest on our pleadings laying out the

21  totality of that testimony and that it stands for the

22  proposition that there's no current plan to create a

23  zone.  And third, this is sort of attenuated but even if

24  the Court were to find that there was a generic threat

25  of enforcement, we still wouldn't have the facts that we

1    would need to conduct this analysis which would be where

2    the zone would be created, at which of the facilities,

3    which size, what shape, what other efforts that facility

4    had taken prior to creating a buffer zone, and all of

5    those are necessary considerations under McCullen.  So

6    to the extent the Court finds there is some sort of

7    threat of creation or threat of enforcement --

8         THE COURT:  Well, wait a minute.  What --

9    whenever we get into the constitutionality arguments --

10        MS. LAHEY:  Yeah, this --

11        THE COURT:  I kind of --

12        MS. LAHEY:  Yeah, this doesn't -- it goes to

13   the standing but it shows why we can't reach the

14   constitutional question.  So the constitutional question

15   requires you to have an answer to where the zone is,

16   what the size is, what other efforts had been taken.

17        THE COURT:  Well, that's for an as applied

18   challenge.

19        MS. LAHEY:  But it's also for the facial

20   challenge because that is what the Court considers --

21        THE COURT:  We all agree, right, that this is

22   a facial challenge and that McCullen is a facial

23   challenge.

24        MS. LAHEY:  I think -- this is where I think

25   the disconnect is, is that I don't think that McCullen

1    stands for the proposition that a 35-foot zone can never

2    be constitutional.  What I think it stands for is that a

3    35-foot zone in Massachusetts, in 2000 --

4         THE COURT:  No, but what I mean is that,

5    you're right, but what it means is that statute creating

6    a 35-foot zone was facially unconstitutional.

7         MS. LAHEY:  But it's sort of facially

8    unconstitutional as applied to Massachusetts at that

9    time because --

10        THE COURT:  Because it wasn't specifically

11   tailored.

12        MS. LAHEY:  Right, so, you know that same

13   statute tomorrow could be constitutional in Kentucky if

14   the underlying facts are the same.  So I think --

15        THE COURT:  If the record in Kentucky were

16   different than the record in the Commonwealth.

17        MS. LAHEY:  Right.  And so I think with that

18   caveat I think it was facially unconstitutional in

19   Massachusetts but as applied at that time.  So I think

20   it doesn't stand for the proposition that you can never

21   have a 35-foot zone, you just couldn't have it in

22   Massachusetts in 2013 and 14.

23        So then the third argument is that the statute

24   chilled speech, speech is chilled when the state takes

25   an action that causes people to hesitate before

1    exercising their right for fear of legal repercussion.

2    And so those risks aren't present here.

3             THE COURT:  I'm not that focused on the chill

4    versus threat because when you do the analysis it still

5    comes down to the threat, the threat and the

6    prosecution, whether it's incredible enough for

7    prosecution.

8             MS. LAHEY:  Right.

9             THE COURT:  Whether you do the chill theory,

10   that's under New Hampshire Right to Life, it comes down

11   to the same analysis pretty much.  There are two

12   different types of injury, but I don't see how the, and

13   the plaintiffs here are focused on the chill argument,

14   but I don't see where it really makes much of a

15   difference analytically, does it?

16            MS. LAHEY:  No, and I don't think that's right

17   because for there to be chilled there has to be a

18   question about whether it's going to be enforced against

19   you and --

20            THE COURT:  Well, let's get down to it, then.

21   It sounds like to me when you distinguish Right to Life,

22   Right to Life has got an official prohibition, this

23   statute doesn't because there can be no zone without

24   establishment of a zone, right?

25            MS. LAHEY:  Right.

1          THE COURT:  So, basically every argument you

2    made today, vis-à-vis standing as far as I understand

3    it, that's the key.

4          MS. LAHEY:  That's correct.

5          THE COURT:  The fact is that there are no

6    zones established yet, therefore there's no credible

7    threat of enforcement.

8          MS. LAHEY:  Correct.  And for that same reason

9    there can be no chill, because if a plaintiff or any

10   plaintiff arrives at a specific site and there's nothing

11   marked, there's no risk that anything will be enforced

12   against you, so any fear of prosecution is not credible

13   because there is no -- it's not reasonable because the

14   statute cannot be enforced against you.

15          And the last point is this concept of

16   unbridled discretion.  And those are used in prior

17   restraint cases.  And this is not a prior restraint case

18   because a prior restraint case would require the

19   plaintiffs to go to the government and seek approval to

20   speak.  And so here there's no constraint on their

21   ability to speak.  They can go to any facility whenever

22   they want and speak.

23          THE COURT:  I agree with you that -- but this

24   kind of raises the same question I want to revisit

25   again.

```
1              MS. LAHEY:  Okay.

2              THE COURT:  I do agree with you that I don't

3    think this is a prior restraint case, and I do agree

4    that the whole unbridled discretion analysis is pretty

5    much a prior restraint analysis, but it gets back to

6    that question I wanted to ask before, and I want to make

7    sure I have this answer.  I don't think it really has a

8    lot to do with today but it's still important to the

9    Court, which is that other than the actions of

10   consultation, signage and demarcation, there's nothing

11   to limit the discretion, in the statute, there's nothing

12   to limit the discretion of the zone creator as to the

13   size of the zone or when to create the zone or why to

14   create the zone, right?  Any time they do those three

15   things they could conceivably have a 25-foot zone.

16             MS. LAHEY:  I think there is a limitation in

17   that there could be -- it requires law enforcement

18   approval, so theoretically --

19             THE COURT:  No, it doesn't.  Show me where it

20   says law enforcement approval in the statute.

21             MS. LAHEY:  It talks about --

22             THE COURT:  It says consultation.  Doesn't say

23   approval.  If it said approval it would be an entirely

24   different argument I think.

25             MS. LAHEY:  Well, it says -- let me just find
```

1    it.

2              THE COURT:  Says right here, 132:38, III.

3    Prior to posting the signage authorized, under paragraph

4    two, a reproductive health care facility shall consult

5    with local law enforcement and those local authorities

6    with responsibilities specific to the approval of

7    locations and size of the signs to ensure compliance

8    with local ordinances.

9              MS. LAHEY:  Right.  So I would read that

10   statute to say that law enforcement doesn't have any --

11             THE COURT:  Approval authority.

12             MS. LAHEY:  They do.  I think that, I think

13   the statute is somewhat ambiguous in that while it

14   states the purpose for meeting with local authorities,

15   and that relates to the sign, law enforcement has no

16   role in enforcing local sign ordinances.

17             THE COURT:  But the other ones do, the local

18   authorities with responsibilities.

19             MS. LAHEY:  Right.  And so what is absent,

20   though, is a purpose for meeting with law enforcement.

21   And so when you go to the legislative history it talks

22   about the requirement that you seek law enforcement's

23   approval.  And that's in --

24             THE COURT:  I know but it's not in the

25   statutes.  I mean, you understand that, right?  There's

 1     no -- are you saying that if the police went to court

 2     and said, you know, name the town, the Manchester police

 3     went to court and said, hey, they've got a 24-foot zone

 4     but we only gave them approval for a 20-foot zone, where

 5     in the statute would that be grounds to enjoin them from

 6     having a 24-foot zone or a -- there's nothing.  See,

 7     that's what I'm trying to ask you.  I asked what in the

 8     statute limits the discretion as to the size of the

 9     zone, the where of the zone, the what of the zone.

10     Other than those three things, which are just hoops to

11     jump through, there's nothing.

12              MS. LAHEY:  I would argue that the

13     consultation with law enforcement could potentially

14     limit it if law enforcement says, look, you don't need a

15     25-foot zone.  There can be some back and forth and the

16     zone is ultimately limited in that point.

17              THE COURT:  Sure there can be back and forth,

18     but if they disagree and the clinic wants 25 feet, what

19     in the statute prevents there from having 25 feet?  What

20     law could the police department cite to say, you know,

21     20 feet would be better?

22              MS. LAHEY:  If I were representing the police,

23     I would cite to the consult and say look, they consulted

24     with us and we said no.

25              THE COURT:  And but a provision of a canon of

1   statutory construction is, you know, words mean what

2   they mean, right?  Consultation doesn't mean approval.

3   It means consultation.

4           MS. LAHEY:  But where it doesn't say the

5   purpose of the consult I think it's --

6           THE COURT:  Implicit?

7           MS. LAHEY:  No, I think it that if it states,

8   for the other it states who you're supposed to meet with

9   and the purpose.  So you're supposed to meet with local

10  authorities for the purpose of determining the sign.

11          THE COURT:  That's to make sure your sign is

12  not too big or it doesn't protrude onto the sidewalk.

13          MS. LAHEY:  Exactly, yup.

14          THE COURT:  That one's kind of -- that one is

15  interpretable.  You can sort of see where it's going,

16          MS. LAHEY:  Sure.  But the deficiency in the

17  statute is that it says meet with law enforcement but it

18  doesn't provide a purpose.

19          THE COURT:  I think that's a very, very true

20  statement.  It's a very, very true statement.  It is a

21  deficiency in the statute.  Doesn't really matter much

22  for today I don't think.

23          MS. LAHEY:  No.

24          THE COURT:  But it's a problem because, look,

25  what that really reads like -- by the way, I'm with you,

1    I don't know what to make of it, you know, you could

2    look at the legislative history and somebody says in the

3    debate or the committee report, yeah, get approval, but

4    that never made it to the statute, all right, and

5    there's no one in the world that is going to enforce

6    approval authority for local law enforcement based on

7    this language.  But, so what it sort of reads like is

8    let the police know you made a zone, or you're going to

9    make a zone so they at least know that there's a zone to

10   enforce the law.  That's how it -- am I speculating a

11   bit?  Yes, I am, but unless there's approval authority

12   or some factors for someone to consider when making the

13   size of the zone, when deciding when a zone is

14   necessary, right, what other measures have been tried,

15   McCullen, right, there's nothing in the statute that

16   requires any of that.  And I guess what you're telling

17   me is, no, not maybe in the letter of the statute,

18   judge, but if you look underneath in the legislative

19   history you might find some guidance.

20            MS. LAHEY:  Right.  I think where we agree

21   that there's a deficiency in the statute, that creates

22   an ambiguity which is sufficient to get to the

23   legislative history and therefore reading the approval

24   requirement.  If that's the intent of the statute, it

25   says, I mean, the majority report talks about that

```
1    they're going to meet with local authorities to craft

2    the zone and then --

3              THE COURT:  Sure.

4              MS. LAHEY:  So I think when you look at the

5    legislative history you should read consult to include

6    consult and approval.

7              THE COURT:  You do, huh?  Let me ask somebody

8    else in the room here.  Is there anybody else here who's

9    willing to tell me that this statute gives localities

10   approval authority over the size, time, place and the

11   zones, anything other than the right to be consulted

12   with, is anyone here ready to say that you have approval

13   authority?

14             MR. LANE:  Not, me your Honor.

15             MS. ELLIOTT:  No, your Honor.

16             MR. CHIESA:  No, your Honor.

17             THE COURT:  All right, that's what I thought.

18   Go ahead.  It doesn't make a lot of difference today

19   except the idea that, you know, except the idea that but

20   for no one has created a zone yet, it could happen

21   pretty quickly.  It could -- you know, if you talk about

22   New Hampshire Right to Life, a big part of New Hampshire

23   Right to Life case and Blum is this concept of

24   disavowal, right, where law enforcement authority says

25   we're not going to enforce the statute.
```

 1          MS. LAHEY:  Right.  But here they don't even

 2    have to disavow because there's nothing for them to

 3    disavow.

 4          THE COURT:  I know, you said that many times,

 5    but okay, tomorrow there's a zone.

 6          MS. LAHEY:  Then tomorrow they have standing

 7    and tomorrow we can come back here and argue the merits

 8    of the case because we will know what the zone looks

 9    like.  We will know where it is.  We will know what

10    efforts were taken.  Right now we don't know that.

11          THE COURT:  Wait, wait, wait, wait, wait,

12    wait.  The McCullen efforts that were taken weren't the

13    efforts of the clinics, they were the efforts of

14    Commonwealth.  Don't get confused about that, right?  It

15    wasn't like, you know, there are efforts that can be

16    undertaken like injunctions and the things that were

17    mentioned, right, but that's, you know, that's

18    interesting but, and I agree it would be a much -- it

19    would be an easier case to wrap our minds around when we

20    have a real, a record, a factual record, but we do have

21    the record of the legislation, and if there's evidence

22    of other measures undertaken --

23          MS. LAHEY:  Well, there is.  There's currently

24    a bill pending right now before the legislature that I

25    just learned of, I've learned of it since -- I learned

1    of it actually this morning -- it's Senate Bill 542.

2              THE COURT:  Just so I'm clear.  So I'm

3    supposed to look at the legislative history of pending

4    legislation?

5              MS. LAHEY:  No, you don't have to.  It's just

6    an example of other efforts that have been taken.  I

7    don't think it bears on the standing.

8              THE COURT:  They're not efforts that were

9    taken prior to the enactment of this statute, right?

10             MS. LAHEY:  No.  But there's nothing to be, I

11   mean, it goes to the threat, this threat of creation.

12   There's no, in addition to the facts that there's

13   nothing to be created -- or I'm sorry, there's nothing

14   that's been created that can be enforced, there are

15   other efforts being undertaken that would basically make

16   it a misdemeanor to harass people in front of

17   facilities.  So that is akin to --

18             THE COURT:  Again, standing can only be

19   established as of the day of the complaint.

20             MS. LAHEY:  Correct.

21             THE COURT:  Just the same way they can't say I

22   gave them standing --

23             MS. LAHEY:  No, I'm not saying --

24             THE COURT:  Let me finish.

25             MS. LAHEY:  Sure.  Sorry.

1          THE COURT:  I don't mean to -- but just the

2     same way they can't say I gave them standing with the

3     agreed to stay, right, which they want to call it an

4     injunction and you don't and I understand all that.

5     It's not an  injunction, it was an agreement.  But just

6     the way, you know, I can't manufacture standing for them

7     with that.  You can't manufacture a lack of standing

8     with ongoing efforts happening right now that have

9     nothing to do with the facial challenge of the statute.

10          MS. LAHEY:  No, and I'm not arguing that it

11     bears on the standing announced just before this Court.

12     What I'm using this as is a response to their argument

13     that there's a threat of enforcement -- I'm sorry,

14     there's a threat that a facility is going to create a

15     zone.  That's not the case.  If you go to the records,

16     the record establishes that's not the case.  And as an

17     aside, they're actually undertaking efforts to do

18     something different than the facility.  So I agree with

19     you.  It doesn't bear on standing at all.  I'm raising

20     it in response to their argument.

21          THE COURT:  Fair enough.  Fair enough.  All

22     right.

23          MS. LAHEY:  So, if the Court doesn't have any

24     further questions for me at this time I will sit, but if

25     I have any response to them I will chime in at the end.

```
 1                THE COURT:  Thank you.  Wait, I want to see if

 2   any of the other defendants want to be heard.  Happy to

 3   hear from anybody who wants to be heard.

 4                MR. LANE:  Well, your Honor, I'm Garry Lane,

 5   we filed a separate motion but --

 6                THE COURT:  I did read it.

 7                MR. LANE:  Unless there's something specific

 8   that you want to question, our arguments are largely the

 9   same with the state with a few additional, but I don't

10   think there's anything we have to address unless you

11   would like to hear from us.

12                THE COURT:  Understood.  Anybody?

13                MR. CHIESA:  Nothing more from Manchester.

14                MS. ELLIOTT:  Your Honor, Samantha Elliott on

15   behalf of the town of Greenland.

16                I have just one small thing to add, and I

17   know, your Honor, you've read the motions and we joined

18   in both the state's motion as well as the other

19   municipal defendants' motions.

20                I just wanted to point out for the record that

21   all of the arguments the state is making about standing

22   in this case apply to the town of Greenland, but apply

23   in some ways even more drastically to the town of

24   Greenland because the state and Attorney General's

25   office has a duty and an obligation to engage in
```

1    litigation to defend the constitutionality of state

2    statutes.

3              THE COURT:  Understood.

4              MS. ELLIOTT:  The town of Greenland doesn't

5    have any such duty.  It's in this case, it's facing the

6    possibility, it's incurring attorney's fees on its own

7    part and facing the possibility of exposing itself to a

8    claim of attorney's fees from the plaintiffs, has taken

9    no position on the constitutionality of the statute and

10   yet here we are.  So, unless and until there's some sort

11   of demarcation of a zone in Greenland, it doesn't seem

12   to be an appropriate party.

13             THE COURT:  Oh, all right.  Understood.

14             MS. ELLIOTT:  Thank you, your Honor.

15             THE COURT:  My understanding, by the way, is

16   while you join in the AG's arguments, the AG is here

17   defending, moving to dismiss the case, but that is the

18   only party defending the constitutionality of the

19   statute, right?  The other defendants are not defending

20   the constitutionality of the statute at this point.

21             MS. ELLIOTT:  Correct, your Honor.

22             MR. LANE:  That's correct, your Honor.

23             THE COURT:  Is that right?

24             MR. CHIESA:  That's correct.

25             MS. LAHEY:  Can I just actually add one thing

```
1    that I didn't --
2              THE COURT:  Of course.
3              MS. LAHEY:  It doesn't go to the merits of
4    standing, but to the extent this Court grants the motion
5    to dismiss, the state would request that in the order it
6    states that any attorney's fees incurred to date go away
7    and are not recoverable if down the road another case
8    arises where a facility creates -- creates a zone and
9    there's another case that goes forwards and they
10   ultimately prevail on that, that the fees incurred in
11   this case, if this case is dismissed, would not be
12   recoverable in any future litigation.
13             THE COURT:  Okay.  Understood.
14             MR. TIERNEY:  Good afternoon, your Honor.
15             THE COURT:  Good afternoon.
16             MR. TIERNEY:  As you are aware, I'm Michael
17   Tierney.  I'm here with my co-counsel, Matt Bowman, on
18   behalf of our seven plaintiffs who have and seek to
19   continue to sidewalk counsel women on public ways and
20   sidewalks outside abortion clinics.
21             As you know, the plaintiffs have brought
22   claims regarding both the facial unconstitutionality and
23   that the statute is unconstitutional as applied to the
24   particular cites mentioned in our complaint.
25             In particular we argue that the statute
```

1   violates the First Amendment by unconstitutionally

2   delegating the authority to create no speech zones in

3   public sidewalks to private actors, and that there is

4   these content-based exemptions that allow pro-abortion

5   speech and allow the ideological opponents of my clients

6   to control their speech in the public fora.

7          THE COURT:  But those content-based exceptions

8   have already been pretty much rejected by McCullen,

9   right?  Those are not really -- to the extent the

10  statute, I mean, your whole point is this statute is

11  similar to the Commonwealth statute, not that it's

12  different, and if it's similar it's not a content-based

13  restriction of free speech.

14         MR. TIERNEY:  That's incorrect.  The McCullen

15  decision was unanimous in that there was a lack of

16  narrow tailoring, okay.  There was a 5/4 split as to

17  whether the exemption --

18         THE COURT:  Sure, the five carries the day.

19         MR. TIERNEY:  The five held that there was an

20  insufficient factual record of what that exemption

21  actually included.  There wasn't a determination that

22  that exemption, okay, was not content-based.  There was

23  a determination that based on the factual record before

24  the Supreme Court, the Supreme Court specifically said

25  --

1          THE COURT:  Five justices said the statute

2    wasn't content-based and no strict scrutiny.

3          MR. TIERNEY:  That there wasn't evidence of

4    what these escorts did.  That's very different than here

5    in New Hampshire where we have evidence that has already

6    been presented to the Court that these escorts can

7    engage and it's part of their job duty to engage in

8    speech that's going to be comforting in getting the

9    woman to come into the clinic.  That's the evidence that

10   was missing in the Massachusetts challenge and the

11   Supreme Court determined in the 5/4 split that it was

12   not content-based.

13          THE COURT:  I see.

14          MR. TIERNEY:  And, you know, we would have the

15   --

16          THE COURT:  You're not quibbling with my

17   reading of McCullen, you're quibbling with the fact that

18   this is the same factual scenario.

19          MR. TIERNEY:  Correct.

20          THE COURT:  Okay.

21          MR. TIERNEY:  Correct.  Now, in the pleadings

22   and in the argument you just heard the state is

23   basically ignoring the fact that we have a facial claim

24   as well as that we have a pre-enforcement as applied

25   claim.  They're basically arguing that because it's

1    pre-enforcement you can't have an as applied claim, and

2    they don't even really touch on the facial claim.  We

3    have standing for both of our claims, the facial and the

4    as applied, which are both pre-enforcement claims.

5            The First Circuit in the New Hampshire Right

6    to Life case put it forth very succinctly that standing

7    exists even though the official charge with enforcement

8    responsibility has not taken any enforcement action

9    against the plaintiff.  And this is a direct quote from

10   the First Circuit, quote, does not presently intend to

11   take any such action.  In the New Hampshire Right to

12   Life case the state had actually promised not to take

13   any action if New Hampshire Right to Life engaged in the

14   speech which they intended to engage in, and they still

15   had standing.

16           You know, more recently we have another First

17   Circuit --

18           THE COURT:  The court in the Right to Life say

19   that the fact that the, specifically said the fact that

20   the AG came in in oral argument and defended the

21   constitution of the statute, was evidence of an intent

22   to enforce.

23           MR. TIERNEY:  Yes, absolutely.

24           THE COURT:  And nobody is talking about that

25   in this case until you just did.

1            MR. TIERNEY:  You just made the point for me,

2    so.

3            THE COURT:  Nobody is talking about Blum.

4    Nobody is talking about Clapper.  It's just sort of, I

5    don't know what to say about it.  I -- well, go ahead.

6            MR. TIERNEY:  I think the First Circuit's case

7    in Van Wagner which was a 2014 case found that when a

8    regulation is alleged to vest unbridled discretion, when

9    alleged to vest that discretion, that that's enough,

10   okay, we don't need to approve the discretion that's

11   been granted.  I think it's pretty clear, even the

12   state's making the argument, that the discretion has

13   been granted to the clinic to determine the size and

14   location, okay, we have standing under Van Wagner.

15           THE COURT:  I don't think they conceded that

16   point, no, but I understand your point.  But, you know,

17   those are prior restraint, you know, Van Wagner is a

18   prior restraint case, that's the discretion we're

19   talking about there.  No one has to seek a permit to

20   engage in the conduct that your clients are engaged in,

21   right?  So it's not really an unbridled discretion

22   analysis, is it?

23           MR. TIERNEY:  Well, it is, your Honor, and I

24   --

25           THE COURT:  But I concur with your point, by

1   the way, I do concur with your point that despite the

2   findings leading up to the statute and the legislative

3   history, I do think the statute affords pretty much

4   unbridled discretion as to the size, up to 25 feet, the

5   timing and the circumstances necessitating a zone.  I do

6   think that those, there's nothing in the statute that

7   seems to me that limits the clinic's consideration of

8   those issues at all.  But that's unbridled discretion,

9   it's unbridled discretion, but I don't know if it's

10  unbridled discretion in the context of Van Wagner which

11  is a prior restraint.

12          Do you see the distinction I'm drawing?

13          MR. TIERNEY:  Well, the distinction is that in

14  Van Wagner, okay, the discretion whether to approve the

15  content on those billboards was held by a government

16  official.  In our case, the discretion whether to allow

17  my client's speech is held by private clinics.

18          THE COURT:  That's a distinction but it's not

19  the one I'm talking about.  I'm talking -- the

20  discretion you're talking about is approving the content

21  of speech, right?

22          MR. TIERNEY:  Ah-hum.

23          THE COURT:  You know, allowing speech,

24  prohibiting speech based on content.  That's not exactly

25  the same as what's going on here.  This is unbridled

 1    discretion in the creation of a zone which has

 2    implications for speech but it's not a prior restraint,

 3    and for some reason you don't want to agree to that

 4    or -- is it that you don't agree with it or that you

 5    don't think it's significant?

 6              MR. TIERNEY:  I don't think that it is

 7    significant that the person who's deciding whether my

 8    speech is allowed, my client's speech is allowed, okay,

 9    is being given the ability to decide it on the fly

10    basically, okay.

11              THE COURT:  You see the difference, though,

12    between discretion over content of speech in the prior

13    restraint context and discretion over the creation of a

14    zone.

15              MR. TIERNEY:  I don't agree that there's a

16    difference, and the reason why I don't agree there's a

17    difference is because of the unbridled discretion given

18    to the clinic.  They can look at one of my clients and

19    decide that because what she's saying on the sidewalk,

20    love all let's say, that they don't have a problem with

21    that, so they are not going to put up a zone, okay.

22              THE COURT:  Sure, but --

23              MR. TIERNEY:  But if my client is saying don't

24    go here, go down the street, they can put up a zone.

25              THE COURT:  Understood, but do you see the

1    difference, that one is prior restraint, one is you are

2    not granted permission to undertake that speech, whereas

3    the hypothetical you just put up the speech did occur.

4    It wasn't a prior restraint, it was a reaction to

5    speech.  You see the difference?

6              MR. TIERNEY:  But it can also happen prior to

7    my client's speech.

8              THE COURT:  Yeah.  Okay.

9              MR. TIERNEY:  Or after or in response to it,

10   okay.  And it can change multiple times in the course of

11   a day.  You know, there's no reason why the clinic

12   couldn't have a ten-foot zone on a certain day when

13   people they don't mind so much are out there or a

14   25-foot zone on a different day when they don't want

15   those people out there.  That's all allowed under the

16   statute.  Whether it happened or not is really

17   irrelevant to the standing question.

18             THE COURT:  That's interesting actually, yeah.

19             MR. TIERNEY:  Now, in preparing the oral

20   argument today we came across a First Circuit case

21   that's on point, and I apologize that we didn't mention

22   it, but this is the Rhode Island Association of Realtors

23   v. Whitehouse, and that case held that there's a

24   credible threat of prosecution and that the standard is

25   quite forgiving in the First Amendment context, okay.

1              THE COURT:  Quite forgiving is as old as Right
2    to Life, though, isn't it, the quite forgiving?  I think
3    so.
4              MR. TIERNEY:  The reason why I think the Rhode
5    Island statute is on point is that that involved a
6    statute that the state hadn't enforced against anyone
7    ever.  It had been on the books for 20 full years.  The
8    state had argued to the First Circuit it's been on the
9    books for 20 full years, you know, there's no standing
10   here.  And the First Circuit rightly said 20 years isn't
11   long enough.  You need to have completely and fully
12   abandoned the statute.
13             The granting of authority is facially
14   unconstitutional right now, okay, that authority has
15   been granted to clinics, and whether those clinics
16   decide to exercise that authority or not is irrelevant
17   to the standing question.
18             New Hampshire Right to Life case also said
19   that when you're dealing with the pre-enforcement
20   challenge, okay, that there will be, quote, assumption
21   of a credible threat of prosecution in the absence of
22   compelling contrary evidence.
23             THE COURT:  Yeah.
24             MR. TIERNEY:  Okay.  And then so to the extent
25   --

```
 1                THE COURT:  But what do you say about the,
 2     what Attorney Lahey would say, okay, is judge, we've got
 3     a huge big 800-pound piece of compelling contrary
 4     evidence which is the fact that no zone has been
 5     established and we, law enforcement, we have no
 6     enforcement authority without the demarcation of a zone.
 7     I mean, that is, I agree with you about the standard as
 8     announced in Right to Life, but address, address the
 9     contrary evidence, the lack of any created zone.
10                MR. TIERNEY:  Well, I don't think that the
11     intent of the clinics is something that we need to be
12     discussing and should be helping the state's argument at
13     all.
14                THE COURT:  Well, you're the one that briefed
15     it heavily.
16                MR. TIERNEY:  We responded to the state's
17     reference to the fact that there is no present intent.
18     In their original motion to dismiss the state argued
19     there is no present intent to put any zones in place.
20     And in fact, the clinic said that there is no present
21     intent because the state has asked us not to demarcate
22     any zones while this litigation is pending, okay.  That
23     was said in the legislative hearing 2015.  It was said
24     just four days ago on February 10th at another
25     legislative hearing on the new repeal bill.  It was once
```

1    again repeated that the only reason why signs have not

2    been demarcated is because the state had asked Planned

3    Parenthood not to do so while this case is pending.

4            The plaintiffs have clearly alleged that as in

5    paragraph 92 of the complaint that they desire to engage

6    in this sidewalk counseling but they fear prosecution if

7    they continue do to so.  We have no answer from the

8    state.  We have no compelling response to the

9    plaintiffs' clear allegation in the complaint.

10           The state's affiant, Linda Griebsch, had said

11   that having the option allows her to negotiate if she

12   does not like the behavior of the sidewalk counselors,

13   okay.  That is happening right now with the fact that

14   she has been given, that the clinic has been given that

15   power.

16           Now, the state also argues on page 12 of their

17   motion to dismiss that the Court would be better served

18   to wait until a buffer zone is actually created and

19   enforced against the plaintiffs in the form of a written

20   warning and probably a hundred-dollar fine before

21   finding standing to challenge RSA 132:38, okay.  So, the

22   state is saying directly in its pleadings to this Court

23   that they want to enforce it against one of my clients

24   prior to us being able to challenge the

25   constitutionality.  There's really no clear threat than

1    what the state has said in its own pleading.

2              Now, the state appears to --

3              THE COURT:  That's not a threat.  That's a

4    standing argument.  I don't, you know, I don't consider

5    it an argument that this can't be challenged until it's

6    enforced as a threat of enforcement.  That's sort of --

7    is that what you're saying?

8              MR. TIERNEY:  The state has said in its

9    pleading that they want to be able to enforce it prior

10   to us having standing to challenge, okay.  That is --

11             THE COURT:  Yeah, that's a standing argument,

12   that there's no standing without enforcement.  I'm not

13   sure I agree with their position, but that's their

14   position.  You're asking me to view that as a credible

15   threat of enforcement.

16             MR. TIERNEY:  That is very different than what

17   happened in the Rhode Island case or the New Hampshire

18   Right to Life pact case where the state says that they

19   weren't going to enforce it.  Right now the state is

20   saying they are going to enforce it.

21             THE COURT:  There's been no disavowal of this

22   statute.

23             MR. TIERNEY:  Correct.

24             THE COURT:  That seems to be the case.  Well,

25   there's been a disavowal of the sense that they're

1    disavowing it in an intent to enforce it as long as

2    there's not a zone, but it doesn't appear that the AG in

3    this is saying that, and disavowal is, you know, in

4    limited cases, especially the recent cases, it's almost

5    the linchpin of this standing analysis.

6              MR. TIERNEY:  Absolutely.

7              THE COURT:  And we don't have it here.

8              MR. TIERNEY:  Absolutely.

9              THE COURT:  We have it here only in the sense

10   that the state says it's disavowing any enforcement

11   without the creation of a zone.  But, you know, this

12   starts to look like it's coming down to this Court has

13   to assess the likelihood that someone is going to create

14   a zone, which is hard to do on this record by the way,

15   because I think that can literally happen overnight.

16   That might not even matter under the state's analysis,

17   but it doesn't seem like it's a huge brick wall of a

18   barrier to enforcement.  It seems like it's something

19   that could happen relatively quickly and easily.

20             MR. TIERNEY:  I would agree, your Honor, and

21   to the extent the Court finds the intent of these

22   private parties at all relevant we should at the very

23   least be given an opportunity to do discovery into those

24   particular clinics that we've named in our complaint if

25   those facts are relevant.  We don't believe they are

1  relevant, particularly not for our count number two

2  where we allege that the statute has unconstitutionally

3  delegated authority to a private actor to control speech

4  in the public forum.

5          Now, there's an overriding argument throughout

6  the pleadings that we have to wait until that authority

7  is exercised to see how they draw things and how it

8  affects different things given the specific facts on the

9  ground, and that isn't the case, okay.  The narrow

10  tailoring needs to happen prior to the enactment of the

11  statute.  And we would actually argue that there needs

12  to be strict scrutiny prior to the enactment of the

13  statute delegating that authority.  This isn't something

14  that a private party does after being given the power

15  and there's no provision in the statute requiring the

16  private party to do anything other than to determine up

17  to that 25-foot limit.

18          There is another recent case out of the First

19  Circuit which makes clear what we have known for a long

20  time that a restriction on speech in a traditional

21  public forum, and the First Circuit is dealing with a

22  content-neutral restriction on speech in a public forum,

23  is facially unconstitutional if it does not survive the

24  narrow tailoring inquiry even though the ordinance may

25  seem to have a number of legitimate applications, okay.

1            So the state's argument that we should wait

2     until something is actually drawn and then, you know,

3     maybe it might be legitimate is irrelevant to our facial

4     claims.  As it said in Cutting v. City of Portland,

5     Maine, 2015 case from the First Circuit, even if there

6     were a legitimate number of applications, something we

7     don't concede, but even if there were, that would not

8     divest us of standing, that would not cause us to lose

9     our facial claim, it would still be facially

10    unconstitutional and we'd still have standing to go

11    forward on that right now.

12            THE COURT:  It's an interesting question,

13    yeah, I mean, you know, Attorney Lahey and I had a

14    discussion about whether it was really a facial

15    challenge and whether McCullen was really a facial

16    decision, and I thought she gave me a good faith

17    interpretation of that, but it does seem

18    counterintuitive to the Court that one would need

19    enforcement, actual enforcement for a facial challenge.

20            Does that make sense, Attorney Lahey?  Do you

21    understand what I'm saying?  I mean, you gave me an

22    understanding of McCullen as yes, facial, but facial

23    based on a real history and evidence that developed, and

24    I understand that.  But it doesn't make sense, does it,

25    to say that we have to have actual enforcement, an

```
 1    actual enforcement action for a facial challenge?
 2              MS. LAHEY:  Well, that's exactly what happened
 3    in Clapper.  I mean, they have found no standing because
 4    the statute had never been enforced, no one had ever
 5    exercised their authority, and so no, I don't think that
 6    that is improper here, because the facial analysis
 7    hinges the, it hinges on the underlying facts.  And
 8    maybe, you know, the McCullen decision is a little
 9    unique in that regard.  And so I think given the facts
10    of this case I think you do need enforcement before you
11    can even reach the facial challenge because you then
12    have the question of which plaintiff, which location,
13    are we going to look at Greenland, are we going to look
14    at Manchester, are we going to look at Concord, you
15    know, all of the efforts are different, all of their
16    histories are different.  So the statute, if -- McCullen
17    doesn't go so far as to say no matter when and where
18    they are enforced, 35-foot buffer zone is
19    unconstitutional.
20              THE COURT:  Right.
21              MS. LAHEY:  You need to look at the underlying
22    facts.  So you need to do that here with ours, and you
23    need to look at --
24              THE COURT:  But certainly the law is not that
25    enforcement is required for standing.  I mean, it's one
```

1   of the -- I mean, it's black-letter law.  You can have

2   pre-enforcement First Amendment challenge.

3           MS. LAHEY:  Sure.  I don't think unnecessarily

4   -- I'm not conceding that if somebody created a zone

5   there's automatically standing because I think there are

6   probably some arguments to be made, but here I'm not

7   arguing that there needs to be enforcement, there needs

8   to be creation.

9           THE COURT:  A zone.

10          MS. LAHEY:  There needs to be creation and we

11  can't conflate --

12          THE COURT:  And you actually anticipated my

13  question.  So that's your position.  It isn't that you

14  need a citation or a warning or an arrest in your view.

15  To confer standing you have at least, you have to have a

16  zone.

17          MS. LAHEY:  Right.  And I think what it boils

18  down --

19          THE COURT:  A demarcated signed consulted

20  zone.

21          MS. LAHEY:  Correct.  The standard is not

22  threat of creation.  It's threat of enforcement.  So

23  under the plaintiffs' analysis you would be basically

24  speculating as to creation to then get to speculation of

25  enforcement.  You would at least need that first step to

1    put this case on par with all the other cases that he's

2    cited.  Creation has occurred in all of those other

3    cases.  Creation hasn't occurred here.  It would be the

4    same thing as saying this legislation is winding its way

5    through the legislature.  If the legislature passes it

6    and creates a zone, then it would infringe on our

7    rights.  So we should enjoin the legislature from

8    passing this.

9              You have to let them create it first and then

10   deal with the question of whether there's a threat of

11   enforcement.

12             THE COURT:  Go ahead.

13             MR. TIERNEY:  As you might expect, your Honor,

14   I disagree.  You know, I think that once it is created

15   you have that immediate injury of the chilling of the

16   speech.  I don't think there's any substantial dispute

17   that when those signs are put up and the government has

18   enforcement power to enforce any speech of my clients

19   within those zones, that there can be no dispute that

20   speech is being chilled at that point.

21             THE COURT:  Once the zones are demarcated and

22   signed.

23             MR. TIERNEY:  Right.

24             THE COURT:  Yeah.

25             MR. TIERNEY:  You know, we argue that the

1    plaintiffs' speech is being chilled right now.  The

2    state hasn't answered that allegation in our complaint,

3    and that complaint allegations need to be taken as true

4    that factual allegation.

5            THE COURT:  Yeah, but a lot of it says your,

6    there's a lot that says your, you know, bare allegation

7    of chill does not confer standing.  There's law that

8    says that.  It's too speculative.  Right?  I mean,

9    you're say, you know, I can point out they're out there

10   doing it now, but your point is they're out there doing

11   it now because of this Court's stay order, right?  But

12   the fact is, the chilling that you allege is more of a,

13   it's a, it's pretty aetherium, right?  It's sort of

14   inchoate.

15           MR. TIERNEY:  I disagree, your Honor.  The

16   chilling is occurring right now because those private

17   clinics are given the negotiating tool as Ms. Griebsch

18   called it, okay, in order to use the authority given to

19   the private clinics to try to squelch my clients' First

20   Amendment rights, okay, that's what the states' own

21   affiant had testified to in her affidavit that was

22   submitted to the Court.

23           Now, we didn't brief the Clapper decision

24   because nobody had brought it up.

25           THE COURT:  When they moved to dismiss they

1  didn't raise it and I realize that.

2      MR. TIERNEY:  Yeah.  But my understanding is

3  that with the Clapper case, that that was a five part

4  speculative contingency before liability.  Five parts.

5  The state's arguing as soon as a clinic, you know,

6  demarcates a zone, it can happen in 5, 25, 30 minutes,

7  okay, that enforcement authority happens right then and

8  there in that 30-minute segment, okay, and that's a

9  whole lot shorter of a period than was the case in

10  Clapper.

11      We have a great case from the First Circuit

12  where it talks about the fact, give me a second here,

13  that, quote, the fact that the deleterious affect of a

14  statute is indirect will not by itself defeat standing.

15  They go on to say that the requirement that an alleged

16  injury be fairly traceable to the defendant's conduct

17  does not mean the defense action must be the final link

18  in the chain of events leading up to that harm.  Okay,

19  that was out of the Wine and Spirits case from the First

20  Circuit.  It is Wine and Spirits v. State of Rhode

21  Island, 418 F.3d 36, a 2005 case.  And in that case the

22  First Circuit rightly recognized that the injury that

23  was complained of is the state's enforcement injury even

24  if the injury may have taken another person's step in

25  order for that enforcement to happen.  That's different

1    from the five-step analysis in <u>Clapper</u>.

2              THE COURT:  Yeah.

3              MR. TIERNEY:  There also is a discussion, I

4    heard the state discussing earlier, that there's a

5    presumption that the clinics are going to act

6    constitutionally and do the narrow tailoring when

7    drawing the zones.  I think the Court needs to go no

8    further than the <u>City of Lakewood</u>, a U.S. Supreme Court

9    case in which the Supreme Court had said that it would

10   be inappropriate to presume that the mayor, okay, will

11   deny a permit application only for reasons legitimately

12   related to health safety or the welfare of Lakewood

13   citizens, okay.

14             The Supreme Court rightly rejected that when

15   you have the authority, it isn't limited by standard,

16   okay.  You can't presume that that government act or the

17   city mayor is going to act constitutionally, and I don't

18   think you can presume that a private clinic will act

19   constitutionally either.

20             The state skips over the SBA List case, <u>SBA</u>

21   <u>List v. Driehaus</u>, Supreme Court case from 2014 in which

22   the SBA List was found to have standing even though this

23   was a pre-enforcement facial challenge and there wasn't

24   any independent act by that private actor that was

25   necessary in that Ohio statute in order for the

1    plaintiff SBA List to have standing.  In that case you

2    need to have the idealogical opponent of SBA List, okay,

3    bring a complaint to the agency prior to the agency

4    having an authority to squelch SBA List's speech, okay.

5    And the state had argued that because you need that

6    private actor to bring the complaint prior to taking

7    that next step, that there was no standing.  Supreme

8    Court disagreed in that case, and likewise the Court

9    should find standing in this case.

10          The state had delegated the authority up to

11   the 25 feet, and we have the facial claim and we also

12   have a pre-enforcement as applied claim.  Given the

13   undisputed fact as far as the clinics mentioned in the

14   complaint, the undisputed facts given the physical

15   attributes as to how their driveways are set up and so

16   on and so forth, we can have a pre-enforcement as

17   applied --

18          THE COURT:  Your as applied action is based on

19   applying the law as enacted to giving physical, you

20   know, scenarios.

21          MR. TIERNEY:  Absolutely.

22          THE COURT:  That's the application.  Not that

23   it's been enforced, applied in that way, but that if you

24   apply the law to these locales.

25          MR. TIERNEY:  Correct.  And the reason why is

1   because if you look at say the Manchester location,

2   every inch that would be covered by the buffer zone

3   would be public fora.  It would be the sidewalk and ways

4   public property which are the traditional province of

5   First Amendment rights.  Very different than in other

6   places such as in Massachusetts where you have a clinic

7   set very far back away from the road that from the door

8   is all effecting private property.  All locations

9   alleged in the complaint, every inch of a buffer zone

10  would be public fora.

11          There was an allegation that the shape and the

12  size are all necessary considerations under McCullen.

13  That is both irrelevant to the standing analysis and

14  quite frankly untrue.  Under McCullen you have the

15  narrow tailoring analysis.  The narrow tailoring

16  analysis is focused on the actions that the state has

17  taken prior --

18          THE COURT:  I'm not focused on the

19  constitutionality of the statute.  I'm focused on

20  standing.  What about this idea.  One of the reasons I

21  bring up Blum and Clapper is that they both make the

22  point that the objective reasonable test isn't really

23  the test.  It's this certainly impending test.

24  Enforcement is certainly impending.  Now, isn't that a

25  more difficult standard for you to satisfy than the old

1   test applied by the Second Circuit in Clapper?

2          MR. TIERNEY:  Well, there's a different test

3   when you're dealing with First Amendment claims than

4   you're dealing with claims outside the First Amendment,

5   okay.  We have numerous cases which hold in the context

6   of the First Amendment, it's a very, very easy threshold

7   to cross --

8          THE COURT:  Yeah, but the test is certainly

9   impending now.

10          MR. TIERNEY:  There was no, in Van Wagner,

11   allegation, you need to have certainly impending.  In

12   Van Wagner the First Circuit recognized all it needs to

13   have is there needs to be an allegation of unbridled

14   discretion.

15          In the SBA List 2014 Supreme Court case there

16   was no allegation that something would have to be

17   impending.  It was just that elections happen every two

18   years.  Litigation takes a long time.  SBA thought they

19   might engage in --

20          THE COURT:  Blum versus Holder.

21          MR. TIERNEY:  Blum versus --

22          THE COURT:  Thus we have repeatedly reiterated

23   that threatened injury must be certainly impending to

24   constitute injury in fact.  And it goes on to point out

25   that Clapper pretty much drove that point home.  Clapper

1   rejected the objective reasonableness test in favor of

2   certainly impending and the court sort of muses and

3   wonders if it's really any different.

4          I'm asking you that question.  Because

5   certainly impending at least, I don't know, sort of

6   linguistically sounds like a heavier burden than

7   objectively reasonable.  It has a certainty, right?

8          So, that's my question to you.  That's why I'm

9   going to ask you folks to brief this under these cases

10  because nobody has, but, I mean, the standard appears to

11  be certainly impending.

12         MR. TIERNEY:  We have not briefed Blum versus

13  Holder, your Honor.  I'm not aware of whether it is a

14  First Amendment case.

15         THE COURT:  Oh yeah.  Here's the Blum case.

16  The Blum case has this big section, okay, in big bold

17  letters, the law of standing for First Amendment

18  pre-enforcement suits.  Yet nobody in this litigation

19  decided to brief it.  And all it talks about is Clapper

20  and Right to Life which people have touched on.  But I,

21  you know, it sets forth some pretty solid First

22  Amendment law.  And one of the major points here is this

23  idea about whether the statute is moribund, not in this

24  case, and if it's not moribund, whether it's been

25  disavowed.  And we're in a situation here where we don't

1     really have disavowal.  We have a statute that the AG is

2     saying is constitutional, and as far as I can interpret,

3     has every intention of enforcing if a zone is created.

4     All right?

5              And Right to Life, in Right to Life the court

6     said the fact that the AG came into oral argument and

7     said we defend the constitution of the statute, that's

8     enough to say they're going to enforce it, and that

9     inferred standing.  That's a significant hurdle, I

10    think, for the state to overcome here, but we don't have

11    a developed argument and I do want to give them a

12    chance, I mean that, to address it.

13             I didn't mean to cut you off.  But you're

14    going to have to be filling me in about that as well.

15             Let me, I guess, you know, here's a question

16    for the other plaintiffs (sic).  You know, there's been

17    sort of, I don't know, conjecture thrown around.  No

18    present intention to enforce, no present intention to

19    create a zone.  We've seen some testimony before the

20    legislature.  Are you prepared to tell me what your

21    clients' positions are at all, and I'm not suggesting

22    you have to, you might not know, regarding the impending

23    creation of any zones.  Is it on the horizon?  Are you

24    just, have you just decided that it's too risky given

25    the circumstances of the law here?  You know, anybody

1    can go first, I don't mind.  Mr. Lane, why don't you go

2    first.

3            MR. CHIESA:  We haven't been asked, your

4    Honor.  The police department hasn't been asked to do

5    anything in this case and we're just following the

6    directions of the AG.  We didn't draft the legislation.

7    I'm sure we're a subdivision of the state, but we

8    haven't been asked to do anything.  And, you know, I

9    would suggest that, you know, perhaps there is standing

10   against the state with regard to the statute, but with

11   regard to the municipal defendants, I mean, we haven't

12   been asked or done anything.

13           THE COURT:  So, you sort of give me a much

14   more blunt way.  What Attorney Elliott gave me was we

15   want out, right?

16           MR. CHIESA:  Yes.

17           THE COURT:  What about that.  Let me ask you a

18   question.

19           MR. TIERNEY:  Absolutely.

20           THE COURT:  I mean, why not cut these

21   municipal defendants loose?

22           MR. TIERNEY:  Absolutely, absolutely.  Your

23   Honor, I told them right from the get-go all they need

24   to do is say that they're not going to enforce this

25   statute and we will let them loose, okay, and --

1          THE COURT:  Okay, so I guess he's asking the

2    same question I just asked.  What's your position on

3    that?  Mr. Chiesa, you can go first.

4          MR. CHIESA:  We're here to follow what the AG

5    says, your Honor, we're a subdivision of the state.

6          THE COURT:  So are you saying -- let me ask

7    you this.  Are you saying you would not, the Manchester

8    police wouldn't enforce the statute unless directed by

9    the AG to do so?

10          MR. CHIESA:  That they would not enforce -- if

11    the AG told them not to enforce it, they wouldn't.

12          THE COURT:  It's a little bit, yeah, it's a

13    little bit of a negative photographic image of what I

14    was asking.  Are you prepared to enforce it before being

15    given the green light to enforce it by the AG?

16          MR. CHIESA:  If the AG tells us to enforce it,

17    we will.

18          THE COURT:  What if the AG says nothing yet?

19          MR. CHIESA:  We will ask the AG.

20          THE COURT:  Yeah.  Anybody else?  Mr. Lane.

21          MR. LANE:  Well, I was just going to first

22    comment on Mr. Tierney's argument that we should just

23    basically concede the case.  We don't want to take any

24    position, and what he's asking us to do is concede that

25    he's right.

```
1              THE COURT:  I don't think he's asking that,
2     unless I misunderstood.  I think he's asking if, I
3     think, and you tell me if I'm wrong because I don't want
4     to drag people to court if they don't have anything to
5     offer and they don't want to be here, I think what he's
6     saying is if you're saying that you have no, not to
7     concede that he's right, just that if you are agreeing
8     not to enforce the statute in those communities, all
9     right, he will dismiss you from the case.
10             MR. LANE:  I view that as a distinction
11    without a difference, your Honor.  He's saying that if
12    we don't enforce it, to me that is saying, okay, we are
13    going to side with the plaintiffs, you know.
14             THE COURT:  Oh.
15             MR. LANE:  Part of the problem is that there
16    are constituents on both sides of this issue in all of
17    our clients.  So we don't want share the position.  And
18    he's asking us to in fact take a position that we would
19    enforce the standard.
20             THE COURT:  While I don't agree that it's the
21    same as conceding that he's correct on the merits, I do
22    understand your point, I do.
23             MS. ELLIOTT:  The only thing I would add, your
24    Honor, is during all of the status reports, the updates,
25    we did consult with both the town office and with the
```

1   police department and there had been no request in

2   Greenland to set up any buffer.  My understanding is

3   that the parties all kind of get along in Greenland.

4          But I wanted to just add that we are in a

5   tough position because we can't, a town can't just

6   decide it's not going to enforce statutes.  It doesn't

7   have the authority to do that.  The AG's office can

8   disavow a statute, but the towns can't do that

9   individually.  And so we can't agree to what the

10  plaintiffs are asking us to do.  If we could, I mean,

11  I'm sure all the municipalities would love to get out.

12          THE COURT:  All right.  Not that I begrudge

13  you being here, you're always welcome here.

14          All right, Mr. Tierney, what else do you want

15  to say?

16          MR. TIERNEY:  If I may, your Honor, I know

17  that the city and counties had raised some separate

18  points from what was raised by the state in their

19  separate motion, and I'd like to address that now unless

20  because it's their motion they wanted to address it or

21  the Court wanted to hear from them first on their

22  particular motion.  And I'm okay either going first or

23  letting them go, whichever.

24          THE COURT:  I don't think they want to be

25  heard really.  I don't think you have to worry about it.

1          MR. TIERNEY:  Okay.  I just didn't want to

2    step on any toes.

3          THE COURT:  No.

4          MR. TIERNEY:  You know, the law is quite clear

5    that when bringing a facial claim, okay, that the facial

6    claim needs to be brought, and I'm quoting New Hampshire

7    Right to Life pact case again, that the proper

8    defendants are the government officials charged with

9    administering and enforcing it, okay.  That's right from

10   the New Hampshire Right to Life pact case.  They are the

11   ones who have the authority to administer and to enforce

12   it.  They're the ones who would be the proper defendants

13   unless of course they agree to give up their enforcement

14   authority either temporarily until, you know, all the

15   appeals in this case are dealt with and, you know,

16   something along those lines, or permanently, you know,

17   obviously we will take the permanently as well.  But

18   where they won't even agree to give the minutest

19   temporary reprieve, that's why they're proper

20   defendants, they need to be in this case.

21          They also argue that the abortion facilities

22   themselves are necessary parties under Rule 19, and that

23   this case needs to be dismissed because they requested

24   that we bring Section 1983 actions against these private

25   parties and we decline to do so.  You know, the

1   plaintiffs don't have any claims against private actors

2   in this case.  If the cities and counties wanted to

3   write claims against the private actors, we likely would

4   assent to, you know, bring whatever claims they want to

5   bring in the context of this case in the interest of

6   judicial economy, but we don't have any claims against

7   them.

8           The three factors under Rule 19 is that we can

9   obtain complete relief against the present parties.  We

10  can obtain complete relief by having the statute

11  declared facially unconstitutional or having the statute

12  declared unconstitutional as applied to these particular

13  locations.  The size and the scope of whatever zone,

14  whoever that authority may be delegated is quite frankly

15  irrelevant to the claims we have brought in this case.

16  It's relevant to the claims that the state wished we had

17  brought, but not to the claims which we have actually

18  brought in this case.

19          Finally, one, on the factors in the Rule 19

20  analysis, there needs to be some reason why, you know,

21  the absent parties cannot now be brought into the case.

22  And I'm not aware of any reason why, you know, the

23  private parties who wanted to be a part of this action,

24  why they couldn't move to intervene to do whatever they

25  want to do, you know, that just isn't present here.

1          THE COURT:  Yup.

2          MR. TIERNEY:  There's an argument that there

3   is a necessity of those private parties taking a step in

4   order for the county and cities' enforcement authority

5   to be exercised against the plaintiffs, and the fact

6   that as they alleged that the private parties need to,

7   you know, post zones of whatever is, you know, in their

8   discretion to do, okay, does not divest us of standing.

9   The First Circuit has spoken clearly in that Wine and

10  Spirits case that the fact that it is indirect and that

11  it may take some other party's actions in order for the

12  plaintiffs to be injured does not divest the plaintiff

13  of standing.  The injury is clearly traceable to the

14  actions of the defendants and therefore we have standing

15  now.

16          Finally, the cities and counties have

17  requested the Court order the plaintiffs to pay the

18  cities' attorneys' fees and costs.  That's quite frankly

19  ludicrous, your Honor.  There's no basis for that.  It

20  appears just to be an improper attempt to try to chill

21  my clients from putting their First Amendment rights

22  forward.  It should be summarily denied.  There's no

23  basis for such a request.

24          THE COURT:  All right.  Let me ask you this,

25  Attorney Lahey.  Actually, if you want --

1           MR. LANE:  Attorney Lane or Attorney Lahey,

2    I'm sorry?

3           THE COURT:  Attorney Lahey.  I'm sorry.  You

4    may have wanted to say some thing.  I will let you go

5    first.

6           MS. LAHEY:  Okay.  I have just a couple quick

7    points that I will take in the order that they came up.

8           First to the statement that we're ignoring the

9    facial challenge.  I don't think that's the case nor do

10   I think the Court thinks that's the case for the reasons

11   that we've talked about.

12          THE COURT:  Yeah.

13          MR. TIERNEY:  Two, I'd like to hit on this

14   point of the test is threat of enforcement.  It's not

15   threat of creation.  And so this kind of hypothetical --

16          THE COURT:  But now you're just playing

17   semantic games.

18          MS. LAHEY:  I don't think I am, and the reason

19   that I'm not is once the zone has been created, then

20   you're in enforcement world and then all of this

21   discussion that we're having is implicated.  But before

22   that point, there is nothing to enforce.

23          So there's no --

24          THE COURT:  Let's me ask you a question.  If

25   that's the case, you know, you're not just in here

1   defending the constitution of the statute.  You've been

2   insisting over and over that this injunction, that you

3   agreed to, by the way, and later claimed that you didn't

4   in a pleading, by the way, you've been insisting that

5   this injunction doesn't apply.  If you can't enforce

6   this, why are you insisting that the injunction that

7   prevents you from enforcing it is something that you

8   can't labor under the yoke of?

9        MS. LAHEY:  Well, well, I don't think we ever

10  agreed to an injunction, we agreed to a stay, and I

11  think --

12       THE COURT:  You didn't agree to an injunction,

13  you agreed to a stay.

14       MS. LAHEY:  Yes.

15       THE COURT:  But you put in a pleading that

16  despite the lack of any jurisdiction, the Court imposed

17  it when you agreed to it, and that was like the first of

18  a few sort of I thought strange assertions you made in

19  your pleadings.  Don't make any difference now.  But I

20  have to wonder why.

21       What is the problem with the injunction?

22  There was never an injunction, but what is the problem

23  with the terms of it given that you say you can't

24  enforce the statute anyway?  You're saying you can't

25  enforce the statute.  There's nothing to worry about

1   here.  But yet don't anybody be under the impression

2   that we are bound not to enforce the statute when you

3   agreed to it.  And then you put in a pleading, when I

4   lifted the stay, you were no longer enjoined.

5          Didn't you argue that?  I can read it back to

6   you if you want.

7          MS. LAHEY:  Well, I take, I guess I'm taking

8   issue with enjoined.  I don't think we ever agreed to an

9   injunction, I think we agreed to a stay which I see is

10  different, and the reason that we would never agree to

11  an injunction is that --

12         THE COURT:  You don't have to say this.  You

13  didn't agree with an injunction, I agree with you.

14         MS. LAHEY:  Okay.

15         THE COURT:  You agreed to a stay.

16         MS. LAHEY:  Sure.

17         THE COURT:  But under the terms of the stay

18  you agreed not to enforce the statute.

19         MS. LAHEY:  Right.

20         THE COURT:  Yet when the stay was lifted,

21  okay, you said we are not prohibited from enforcing the

22  statute now.

23         MS. LAHEY:  Well --

24         THE COURT:  How is the Court supposed to take

25  you seriously that you have no intent to enforce the

1    statute, okay, when you're insisting that not only is it

2    constitutional, which is a very dubious claim to make,

3    you know, the idea that this is a clearly constitutional

4    statute because of the legislative history, like terms,

5    that's, I'm not saying it's unconstitutional because I

6    think we haven't really explored that yet, but it's

7    definitely got problems.

8            MS. LAHEY:  Sure.

9            THE COURT:  Okay.

10           MS. LAHEY:  And I don't think I've ever

11   represented that it's clearly constitutional.

12           THE COURT:  Okay, you haven't represented

13   that.

14           MS. LAHEY:  Okay, so I guess --

15           THE COURT:  Attorney Lahey, you've got to

16   break this habit of interrupting me.

17           MS. LAHEY:  Sorry.

18           THE COURT:  I know you don't mean to, but

19   you've got to stop.  I'm trying to ask you a question.

20           I'm trying to ask you how I can take you

21   seriously that you have no present intention of

22   enforcing this statute when you strive so mightily to

23   say that there's nothing prohibiting you from doing it.

24   I mean, it was very important to you in several

25   pleadings to make sure that you say we didn't agree to

1   this and now that the stay has been lifted there's

2   nothing stopping us, it doesn't apply to us anymore,

3   these terms of the stay don't apply.  Now, you put in a

4   footnote we'll still inform the Court if we intend to

5   enforce it, which I appreciate, but still, the law of

6   the case law says if you're not disavowing enforcement,

7   there's probably standing.  There are a lot of cases

8   that say that, including First Circuit authority, New

9   Hampshire Right to Life, Blum, and there's been no

10  disavowal here.  The only disavowal that you've been

11  willing -- let me just ask you.

12          If the town of Greenland establishes a zone

13  tomorrow, are you disavowing enforcement during at least

14  the pendency of the litigation, are you disavowing

15  enforcement at all?

16          MS. LAHEY:  So if the town of Greenland

17  created a zone tomorrow?  Without speaking with the

18  Attorney General I can't answer that definitively, but I

19  would at least go as far as to say it's possible -- we

20  wouldn't -- I can't tell you either way, but I'm not

21  going to tell you --

22          THE COURT:  I have to ask you this.  You don't

23  think that coming in here today, given all the law about

24  disavowal, that that should be a question you're

25  prepared to answer today before talking to the Attorney

1   General?

2        MS. LAHEY:  Well, the reason that I, I have

3   had a conversation with the Attorney General about it,

4   and the reason that we can't take a position of yes or

5   no is because we don't know the underlying facts.

6      THE COURT:  Of the zone, okay.

7        MS. LAHEY:  So if tomorrow a zone is created

8   in Greenland because somebody was shot, we're going to

9   enforce that I would imagine.  If the town of Greenland

10  creates a zone tomorrow --

11       THE COURT:  So now you're invoking people

12  being shot in a statute where we're at 12(b)(6) and

13  there's no disagreement that -- let's not go there.

14       MS. LAHEY:  Well, no, and I think that gets

15  to --

16       THE COURT:  I don't think you got to enforce

17  this statute if somebody gets shot in Greenland, right?

18  My question for you is, let's assume a zone was created

19  tomorrow that, you know, I don't know, seemed to be

20  justified by whatever the people in the place thought

21  circumstances justified.  People had crossed the line a

22  little bit.  Maybe got aggressive with their so-called

23  counseling, right, which is, you know, it's

24  demonstrating in some point, I understand that, and the

25  zone was created and it was, I don't know, 19-and-a-half

1    feet.  Someone was really careful about creating a zone.

2    My question for you is, does the AG disavow enforcement

3    of this statute, because that's a critical factor in

4    this analysis?

5            MS. LAHEY:  I don't, without knowing the

6    underlying facts, I doesn't couldn't say whether the

7    Attorney General would disavow it.

8            THE COURT:  Depends on the zone and the

9    situation.

10           MS. LAHEY:  Right.  And that said, I don't

11   think that this case, given where we are with no zone,

12   that disavowal is the linchpin.  Now, I think it would

13   be the linchpin if we had a zone created and I was

14   standing up here saying I can't disavow it, then I think

15   all of those cases are implicated.  But we aren't to

16   that point yet because no zone has been created, so

17   there's nothing for us to disavow.

18           THE COURT:  Sure, but that goes to my question

19   for you earlier about what really, what in the statute

20   constrains the creation of a zone.  What in the statute

21   constrains its size undertake 25(b).  The circumstances

22   under which it's created.  The configuration.  The time

23   -- when a clinic decides to create one.  And I ask the

24   municipalities, all right, the street enforcement

25   authority and they say there's nothing in your

```
 1   consultation rights or consultation function here that
 2   let's them participate in any sort of discussion like
 3   that.  There's nothing to guide a clinic in this statute
 4   whatsoever about when to do a zone, how big the zone
 5   should be up to 25 feet, or the circumstances triggering
 6   the creation of a zone.  Zero.
 7            So, if the fact that no zone has been created
 8   is so important, isn't it significant that there's
 9   really nothing in the statute to stop that from
10   happening, as the plaintiffs point out, in five minutes?
11            MS. LAHEY:  No.  And I think that, what you
12   just described would go to the merits.  It doesn't go to
13   standing.  And one piece that I would like to touch on
14   and potentially have the opportunity to brief is that we
15   have never understood the initial complaint to raise a
16   nondelegation question, and so we have never addressed
17   that.
18            THE COURT:  Because it's count two, right?
19            MS. LAHEY:  Correct, count two.
20            THE COURT:  You want to take a look at that
21   now?
22            MS. LAHEY:  Yeah, I mean, so count two --
23            THE COURT:  Actually I think I have it here.
24   Jadean gave me a superduper notebook.  Let me see here.
25   Is the complaint in here?  No, okay.  So, anybody have
```

1    an opinion about that?

2              MS. LAHEY:  It's just something that at least

3    we've never understood to be the case.  We talked about

4    it in a nondelegation context, but there's a difference

5    between nondelegation and the Fifth Amendment.  It's

6    just I never read it to mean that, so we haven't --

7              THE COURT:  So, I guess the question comes

8    down to whether I read it that way, and I'll figure it

9    out, but I don't really need to figure it out right now.

10   I don't think I -- yeah.

11             MS. LAHEY:  Okay.  So I think going to your

12   question that the nature of the delegation of the power

13   goes to the merits and that the case law, and I haven't

14   gone through it extensively because I never briefed it,

15   but my initial reading is that the delegation itself is

16   not sufficient to confer standing.  You need the party

17   to whom the power or authority is delegated to actually

18   exercise that authority, and that hasn't happened here.

19             THE COURT:  Wait a minute.  Wait a minute.

20   You're saying that if -- you're saying that if power was

21   delegated to Planned Parenthood, or pick your clinic, to

22   say if I want to walk outside with a sandwich board, I

23   have to bring the sandwich board to Planned Parenthood

24   and they have to approve the message.  I have to wait

25   for them to either approve or not approve before

1  challenging that as improper delegation to a private

2  party of restrictions on free speech?  That would seem

3  to be a --

4          MS. LAHEY:  So what I have, what I've done is

5  I pulled the New Hampshire nondelegation cases, and none

6  of them have squarely addressed the standing inquiry,

7  but in all of them that I found that addressed the

8  procedural --

9          THE COURT:  The delegated party took action.

10          MS. LAHEY:  Yes.  And that's what prompted the

11  litigation, so that's what I'm representing to you.

12          THE COURT:  Fair enough.

13          MS. LAHEY:  I'd like to hit on again the

14  difference between discretion to create and discretion

15  to, or threat of creation and threat of enforcement, and

16  the standard is threat of enforcement.

17          All of this pre-creation discussion, it's

18  hypothetical.  What if they do this?  What if they

19  create a ten-foot zone today and 20-foot zone tomorrow?

20  That's all speculation.  That doesn't get you standing.

21  What the Court should do is wait and see what the party

22  does.  If they create a zone that looks like that and it

23  switches day by day, then you could address the merits

24  of that, but this --

25          THE COURT:  Yet when I suggested I grant your

1    motion to dismiss, okay, and let's wait to see if

2    something happens, somehow that was unacceptable.

3            MS. LAHEY:  Well, the reason it was --

4            THE COURT:  When I wanted to grant your motion

5    to dismiss.

6            MS. LAHEY:  Well, I can tell you, can I tell

7    you, I guess --

8            THE COURT:  Maybe not.

9            MS. LAHEY:  Yeah, it's something that's been

10   raised here, I think we've even discussed it with the

11   Court, the hang-up was the attorney's fees.  So it

12   wasn't that --

13           MR. TIERNEY:  I disagree, your Honor, that was

14   not --

15           THE COURT:  Okay, okay, you disagree, I get

16   it.   Fair enough.  Let me ask you this.  You've gone

17   so far, I've asked you about disavowal and you give me I

18   think a good faith answer, because in your papers, I

19   mean, I'm looking for the language, you don't disavow,

20   but you go to the depth of saying that enforcement is

21   not even remotely possible, all right.  Yeah, a couple

22   times.  Page 11 of document 63-1 which I think is your

23   renewed memorandum of law.  Plaintiffs cannot

24   demonstrate that prosecution under the statute is likely

25   at this time or even remotely possible because they

1    cannot show a credible threat of enforcement.

2            That entire argument is based on no zone

3    demarcation yet, no zone creation.

4            MS. LAHEY:  Correct.

5            THE COURT:  All right.  That's what it comes

6    down to.

7            All right, here's what I want to do.

8    Actually, let me take a break.  Let me take a quick

9    break and we will convene in a few minutes.  I want to

10   give the reporter a break.  She's been going for about

11   an hour and a half.  So we'll take a ten-minute break.

12           MR. TIERNEY:  Will I be able to respond?

13           THE COURT:  Of course.

14           MR. TIERNEY:  Okay.

15           (Recess taken.)

16           THE COURT:  Okay.  I'm pretty much ready to

17   wrap up here.  Mr. Tierney, you said you wanted to say

18   something.

19           MR. TIERNEY:  Yes.  Thank you, your Honor.

20   First I want to correct something that I think I

21   misspoke, I may have even miswritten in the pleadings

22   that the unbridled discretion theory was in count two.

23   I just looked at it.  It's actually in count one, in

24   particular paragraphs 105 --

25           THE COURT:  We were calling it improper

1    delegation, right?

2           MR. TIERNEY:  I'm sorry, yes, improper

3    delegation.

4           THE COURT:  Which is where the unbridled

5    discretion lies here but, if it's anywhere, so it's not

6    count two, it's count one?

7           MR. TIERNEY:  It's in count one, correct.

8           THE COURT:  I think you might have mislabeled

9    count two.  Count two looks likes it says delegation but

10   it really talks about Vegas.

11          MS. LAHEY:  Right.

12          MR. TIERNEY:  And I apologize.  I think that's

13   exactly what happened.  Is that we had thrown things

14   under the wrong heading, and I apologize, but it is

15   there in perhaps 105 to 108.

16          THE COURT:  Thank you.

17          MR. TIERNEY:  The test as far as threat of

18   enforcement versus threat of creation, I don't think the

19   Court has to go very far on that.  The SBA List, that's

20   the same argument state of Ohio made, the Wine and

21   Spirit case, that's the same argument the state of Rhode

22   Island made, and the U.S. Supreme Court as well as the

23   First Circuit have both rejected the argument that the

24   state is making here today.

25          THE COURT:  Well, what argument in particular,

1    what Supreme Court and First Circuit cases have rejected

2    that, this idea that creating a zone is a significant

3    difference, significant barrier?

4              MR. TIERNEY:  Well, what they're arguing is

5    that because there is a step that needs to take place

6    prior to the enforcement, okay, that that means that you

7    can't have any enforcement.  That's the same argument

8    state of Ohio made in the SBA List because you didn't

9    have that complaint by the ideological opponent to the

10   election board prior to the state being authorized under

11   its statute to take any enforcement action.  The same

12   argument that was made in the Wine and Spirits case,

13   okay, that you had an independent action that wasn't the

14   state's action that needed to take place in order for

15   the state to have that enforcement power.  And in both

16   cases, okay, the fact that there was other action that

17   needed to take place wasn't relevant or wasn't divesting

18   of standing.  Both cases were focused just on the issue

19   of standing.

20             So, it's important of course to remember that

21   we're arguing that the delegation of that power to

22   control the sidewalk is itself unconstitutional

23   regardless of whether that power is ever exercised.  But

24   even if, as the state argues, that you need to show

25   enforcement power prior to their being standing, that's

 1   contrary to what the Supreme Court and the First Circuit

 2   has held.

 3            As the Court has already alluded to, none of

 4   the parties address Blum, and we would appreciate if the

 5   state is going to address Blum that we have the

 6   opportunity to respond to that in some way.

 7            THE COURT:  Sure.

 8            MR. TIERNEY:  But, you know, the Blum and

 9   Clapper decisions had focused on the fact that their

10   analysis is particularly rigorous, that's the word that

11   was used, when asked to decide whether action taken by

12   one of the other two branches of the federal government

13   --

14            THE COURT:  That's action of other branches of

15   the federal government.  That's not the case here,

16   that's right.

17            MR. TIERNEY:  Correct.  And it's also

18   important that in Blum you have the government

19   disavowing affirmatively, which isn't the case here.

20   So, if there's going to be some consideration to the

21   applicability of Blum, we don't think it is applicable

22   because you don't have the disavowment and you don't

23   have a federal government actor, but if the state is

24   going to file something, we'd like, you know, whatever

25   ability to respond to that.

1        THE COURT:  Ms. Lahey, anything you want to

2   say?

3        MS. LAHEY:  Yes, I just have two points.  The

4   first is their statement about the SBA List case.  That

5   case is different than ours.  So, in that case the

6   statute at issue on its face bans certain speech.  So

7   you couldn't criticize a candidate during an election

8   cycle.

9        THE COURT:  It was content-based.

10       MS. LAHEY:  But that wasn't conditioned on

11  anything.  It's not that that can be prohibited if

12  another actor defines what speech is banned.  I mean, I

13  was just the statute says this speech is banned period,

14  and there was enforcement authority.

15       THE COURT:  Well, was the enforcement

16  authority, I haven't read that case I'm going to tell

17  you now, was that triggered by the filing of a

18  complaint, is that the issue?  So your point is that

19  it's like this case in the sense that there's a

20  condition precedent to enforcement.  Sua sponte that

21  authority could not enforce.

22       MR. TIERNEY:  Correct.

23       MS. LAHEY:  But I think the court found that

24  the complaint process itself was, that created the

25  injury, and so when you were going -- when you have to

1    go before I think it was a commission, that's creating

2    your injury.  Here, the creating of the zone doesn't

3    create an injury.  It's the threat of enforcement that

4    creates an injury.  But you need to have that creation,

5    and then once you have that creation, then you can have

6    threat of enforcement which will create the injury.  But

7    you can't conflate and say that the process of having a

8    complaint brought against you and somebody creating a

9    limitation are the same things.  The statute in Susan B.

10   Anthony, there was no condition precedent to the conduct

11   that was prescribed.  Here there's a condition precedent

12   to the conduct that's prohibited, and that's the

13   difference.

14          THE COURT:  So here -- I want to follow your

15   reasoning.  Here there's a condition precedent to the

16   conduct that's prohibited because you mean the conduct

17   being the, I don't know, communicating in the zone?

18          MS. LAHEY:  Right.  So the statute as it

19   exists now doesn't ban any speech.  What it does is

20   authorizes a facility to create --

21          THE COURT:  A zone.

22          MS. LAHEY:  -- a zone which if that zone is

23   created, then speech is affected.  But here in Susan B.

24   Anthony, on its face the statute prevented certain

25   speech.  And one of the factors that the court looked

1    at --

2             THE COURT:  Yeah, in the complaint it would be

3    about conduct that already occurred.

4             MS. LAHEY:  Right.  And so in that case the

5    court found that there was standing based predominantly

6    on two factors.  One, that there had already been a

7    finding of probable cause against one of the parties.

8    And the other one -- there were two plaintiffs in that

9    case.  There had already been a finding of probable

10   cause against one of them, so therefore the statute had

11   already been enforced against one of them.  And the

12   other one couldn't rely on that prior finding of

13   probable cause to get their threat of enforcement.  And

14   then two, that the complaint could be raised by anybody,

15   and so that there were an unlimited number of people who

16   could bring this complaint, that the court said that

17   created increased harm because anybody could complain,

18   drag you in front of the commission which they equated

19   to litigation which you'd have to incur costs and it

20   could take you out of the election cycle.  So that's not

21   what we have here.

22            And then just the second piece is I want to be

23   clear that your position, Attorney Tierney, is that the

24   delegation --

25            THE COURT:  He was saying that his delegation

1    argument --

2            MS. LAHEY:  Is in paragraphs 105 --

3            THE COURT:  105 through 108 in count one if I

4    understood him correctly.

5            MS. LAHEY:  Yeah, so I don't read, the word

6    delegation doesn't appear in there.  It talks about

7    unbridled discretion.  So again, I'd just like to

8    reiterate, to the extent that the Court reads it that

9    way --

10           THE COURT:  Certainly -- here's what the Court

11   reads.  I don't know whether their counts make an

12   improper delegation cause of action or grounds for cause

13   of action.  I don't know that.  I don't know how much

14   difference it makes vis-à-vis standing.  Probably not

15   much.  I do think -- I am of the opinion that the

16   clinics are afforded a great deal of discretion to

17   create zones here with zero guidance from the statute.

18   The only limitations on the discretion of the clinics in

19   creating the zones are the 25-foot maximum radius and

20   the requirements of consultation, signage and

21   demarcation.  That's all I can find in the statute.  But

22   whether that, you know, so I do find there to be a lot

23   of discretion.  I don't have an opinion about whether

24   their complaint asserts a cause of action for improper

25   delegation.  Certainly, though, it's obvious here that

1    there is in some sense some delegation going on.

2              MS. LAHEY:  Correct.  And I think I've made

3    this point but those, the question about whether there

4    are any constraints on that delegation go to the merits

5    and that it doesn't go to standing.

6              THE COURT:  It doesn't implicate standing as

7    far as you're concerned.

8              MS. LAHEY:  Correct.

9              THE COURT:  Okay.

10             MS. LAHEY:  And so but to the extent the Court

11   sees differently we'd like the opportunity to brief it

12   because we never understood that to be a claim.  In

13   speaking with counsel outside I think they briefed that

14   argument in one of their motions, but that was only

15   because it had come up in a status conference that took

16   place after we had filed our pleadings, so.

17             THE COURT:  All right.

18             MS. LAHEY:  That's it.

19             MR. LANE:  Your Honor, could I say one more

20   thing?

21             THE COURT:  Of course you may.

22             MR. LANE:  In response to our motion Mr.

23   Tierney said that the case law establishes that the

24   proper defendants are the enforcement authorities.  I

25   just want to make clear.  We don't disagree with that in

1   the normal case.  You would normally, if the municipal

2   authorities already had the power to enforce something,

3   then we'd be appropriate defendants in this situation.

4   But this is not the normal case.  And that's the whole

5   point, is that until an event precedent occurs, my

6   client and the other municipal defendants don't have any

7   authority to enforce anything, therefore the case law

8   that he's talking about just simply doesn't address the

9   situation at all.

10          THE COURT:  All right.  Here is what I want to

11  do.  I've sort of grouchily pointed out a few times now

12  the parties didn't brief what I think are important

13  cases, the First Circuit case Blum and its reliance on

14  Clapper.  So I want to give you a chance to either tell

15  me that, as Mr. Tierney just did, that those cases don't

16  have any bearing on this case or how they bear on the

17  case.  In other words brief, add to your briefing a

18  little bit incorporating Clapper and Blum.  And if you

19  want to talk about that Rhode Island case, feel free, or

20  any other case you want, you know, cases are cases, but

21  I want to hear about those cases because Blum is a

22  pretty, it's a little survey of the law on this topic

23  and this case presents a unique fact with this

24  demarcation as a prerequisite to enforceability.  And

25  when I analyze this I'll probably analyze it under both

1    the interpretations you've advanced in the statute, the

2    plaintiffs' interpretation that the zones already exist

3    and the defendants' that they don't exist until

4    demarcation, I'll probably analyze both ways just to

5    make sure I'm covering the bases.  But that said, I do

6    think at least at this point that the defendants'

7    interpretation is more plausible.  But I'm going to

8    order you to do a little more briefing in this case.  I

9    guess I want to ask you -- let's go off the record.

10              (Off the record.)

11              THE COURT:  I was considering, I was

12   considering, I don't know if any of you consulted, I was

13   considering asking the New Hampshire Civil Liabilies

14   Union to file an amicus brief in this case.  I don't

15   know which side of this issue they'd be on to be honest.

16   Maybe you do.  Has anybody consulted with them at all?

17              MS. LAHEY:  Well, I can tell you that I spoke

18   with Attorney Bissonnette socially about it, so I know

19   they are aware of it and have thoughts on it.  I didn't

20   necessarily talk to him about the standing issue.  I

21   talked to him more about the merits.

22              THE COURT:  It's a very good point because

23   they probably have a lot, I wouldn't be surprised if

24   they are very aggressive on standing but maybe have a

25   different view of the -- I don't know.

1          MS. LAHEY:  Correct, so I know it's in their

2     radar.

3          THE COURT:  I think they're pretty much pro

4     standing under all circumstances, right?

5          MR. TIERNEY:  I have also had conversation was

6     Attorney Bissonnette and he's explained to me the

7     conflict that he faces with free speech and the abortion

8     rights.

9          THE COURT:  Of course.  That's the whole point

10    of this case.

11         MR. TIERNEY:  I think that the New Hampshire

12    ACLU would like to stay out of it.

13         THE COURT:  I see.

14         MR. TIERNEY:  So as not to --

15         THE COURT:  So my sense is you think it's a

16    nonstarter?

17         MR. TIERNEY:  Correct.

18         THE COURT:  Yeah.  All right.  Thank you.  I

19    appreciate your presentations and I look forward to your

20    filings and we'll get a resolution.

21         MR. TIERNEY:  Thank you, your Honor.

22         MS. LAHEY:  Thank you.

23         (Hearing adjourned at 4:15 p.m.)

24

25

86

```
1                    C E R T I F I C A T E

2

3              I, Sandra L. Bailey, do hereby certify that

4    the foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 4/29/2016      _____

10                             SANDRA L. BAILEY, LCR, CM, CRR

11                             LICENSED COURT REPORTER, NO. 15
                               STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```