# United States Court of Appeals
## For the First Circuit

---

No. 16-1432

MARY ROSE REDDY; SUE CLIFTON; JENNIFER ROBIDOUX; JOAN ESPINOLA;
TERRY BARNUM; JACKIE PELLETIER; BETTY BUZZELL,

Plaintiffs, Appellants,

v.

JOSEPH FOSTER, in his official capacity as Attorney General for
the State of New Hampshire; D. CHRIS MCLAUGHLIN, in his official
capacity as County Attorney for Cheshire County, NH; SCOTT W.
MURRAY, in his official capacity as County Attorney for
Merrimack County, NH; DENNIS HOGAN, in his official capacity as
County Attorney for Hillsborough County, NH; PATRICIA CONWAY, in
her official capacity as County Attorney for Rockingham County,
NH; CITY OF MANCHESTER, NH; CITY OF CONCORD, NH; CITY OF KEENE,
NH; TOWN OF GREENLAND, NH,

Defendants, Appellees,

THOMAS P. VELARDI, in his official capacity as County Attorney
for Strafford County, NH; TOWN OF DERRY, NH,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, Chief U.S. District Judge]

---

Before

Lynch, Lipez, and Barron,
Circuit Judges.

---

Michael J. Tierney, with whom Wadleigh Starr & Peters PLLC, Matthew S. Bowman, Kevin H. Theriot, and Alliance Defending Freedom were on brief, for appellants.

Elizabeth A. Lahey, Assistant Attorney General, New Hampshire Department of Justice, for appellee Joseph Foster.

John T. Alexander, Garry R. Lane, Ransmeier & Spellman, P.C., Samantha D. Elliott, and Gallagher, Callahan & Gartrell, P.C. on brief for municipal appellees.

---

January 11, 2017

---

**LYNCH**, **Circuit Judge**.   The district court dismissed without prejudice, for lack of Article III standing, this pre-enforcement challenge to a New Hampshire statute that has not been activated or enforced since its enactment in mid-2014.  We agree that the challenge is not ripe and that there is no present Article III case or controversy before the court.  We affirm the dismissal without prejudice.

The statute in question is New Hampshire Senate Bill 319, entitled "An Act relative to access to reproductive health care facilities" ("the Act"), which Governor Maggie Hassan signed into law on June 10, 2014.   See N.H. Rev. Stat. Ann. ("RSA") §§ 132:37–132:40.   The Act permits (but does not require) a reproductive health care facility to demarcate a zone extending "up to 25 feet" onto public property adjacent to any of the facility's private entrances, exits, or driveways.   Id. § 132:38, I.   If a facility has demarcated a zone by posting the required signs, following the procedure specified, then members of the public (with certain listed exceptions) may not "knowingly enter or remain on [the portion of the] public way or sidewalk" within that zone.   Id.   The Act is enforced civilly, by its terms.   See id. § 132:39.

McCullen v. Coakley, 134 S. Ct. 2518 (2014), which held unconstitutional a buffer zone statute in Massachusetts, was decided by the U.S. Supreme Court on June 26, 2014, shortly after

the signing of the Act.  Soon thereafter, the plaintiffs commenced
this action in federal district court.  Their complaint seeks to
enjoin enforcement of the Act and to have the Act declared facially
unconstitutional under McCullen.  They filed the lawsuit before
any facility[1] had demarcated a buffer zone, and it remains true
that no facility has ever created one.  The parties agreed to a
protracted stay, during which they agreed to preserve the status
quo, and which was in effect until they agreed to dissolve the
stay in part on August 27, 2015.[2]  See Reddy v. Foster, No. 14-cv-
299-JL, 2016 WL 1305141, at *3 (D.N.H. Apr. 1, 2016).  The district

---

[1]    The Act defines a "reproductive health care facility" as
"a place, other than within or upon the grounds of a hospital,
where abortions are offered or performed."  RSA § 132:37, I.  We
use the terms "facility" and "clinic" interchangeably in this
opinion.

[2]    More specifically, the stay rested on agreements that
(1) no defendant would enforce the Act unless and until a clinic
created a buffer zone; and (2) "[a]ny defendant who receive[d]
notice, through whatever means, that a . . . clinic intend[ed] to
post . . . signage" -- thereby creating an enforceable buffer
zone -- would "immediately notify the plaintiffs, through their
counsel," at which point a preliminary injunction hearing would
occur "forthwith."  One purpose of the stay was to give the
legislature a chance to reconsider the Act in the wake of McCullen.
Although the New Hampshire House voted to repeal the Act during
its 2015 session, see H.B. 403, 2015 Leg., Reg. Sess. (N.H. 2015),
the Senate tabled the repeal bill and took no action on it, see
Reddy, 2016 WL 1305141, at *3.  In 2016, the House voted again to
repeal the Act, see H.B. 1570, 2016 Leg., Reg. Sess. (N.H. 2016),
but the Senate declined again to pass the House bill, see Paige
Sutherland, N.H.'s 25-Foot Buffer Zone Around Abortion Clinics
Will Stay, N.H. Pub. Radio (May 6, 2016), http://goo.gl/NfCIcj.

court ultimately granted the defendants' motion to dismiss for lack of standing. Id. at *1.

We agree with the district court that this pre-enforcement facial challenge to the Act's constitutionality relies on overly speculative allegations of injury in fact and is "premature." Id. The plaintiffs have shown neither standing nor ripeness. First, the plaintiffs have not alleged that the Act has meaningfully altered their expressive activities, nor that it has objectively chilled their exercise of First Amendment rights. Because no facility in New Hampshire has yet demarcated a zone, and there is no present evidence that a zone will ever be demarcated, the plaintiffs' "alleged injury is . . . too speculative for Article III purposes." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 565 n.2 (1992)). Second, the plaintiffs have failed to establish standing either by arguing that case law about prior restraint applies, see Van Wagner Bos., LLC v. Davey, 770 F.3d 33 (1st Cir. 2014), or by arguing from the fact that the Act authorizes private clinics to create buffer zones. The Act is not a prior restraint, and there are no factual allegations that a clinic has used its zone-drawing power as a tool to change the plaintiffs' behavior. Third, because the plaintiffs have not alleged a present chill, and because they have failed to allege the contours or location of any buffer zone, or why such a zone

was created, we have no ripe case to adjudicate and no facts that would allow us to fashion judicial relief.  <u>See</u> <u>Texas</u> v. <u>United States</u>, 523 U.S. 296, 300 (1998).

## I.

### Background

Because the district court granted a motion to dismiss for lack of standing, <u>see</u> Fed. R. Civ. P. 12(b)(1), "'we accept as true all well-pleaded fact[s] . . . and indulge all reasonable inferences' in the plaintiff[s'] favor." <u>Kerin</u> v. <u>Titeflex Corp.</u>, 770 F.3d 978, 981 (1st Cir. 2014) (first alteration in original) (quoting <u>Katz</u> v. <u>Pershing, LLC</u>, 672 F.3d 64, 70 (1st Cir. 2012)). The record properly before us consists of both the complaint and "other materials in the district court record," whether or not the facts therein are consistent with those alleged in the complaint. <u>Downing/Salt Pond Partners, L.P.</u> v. <u>Rhode Island</u>, 643 F.3d 16, 17 (1st Cir. 2011).

A.   <u>Legislative History of the Act</u>

In its "Statement of Findings and Purposes" accompanying the passage of the Act, the New Hampshire Legislature found that "[r]ecent demonstrations outside of reproductive health care facilities" had (1) "resulted in the fear and intimidation of patients and employees of the[] facilities," (2) "caused patients and employees . . . to believe that their safety and right of privacy [we]re threatened," and (3) "resulted in the fear and

- 6 -

intimidation of residents and patrons seeking to enter or leave their homes or other private businesses adjacent to the . . . facilities." The Legislature simultaneously found, however, that "[t]he exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity that must be protected." Accordingly, the Legislature concluded that

> establishing a limited buffer zone outside of some reproductive health care facilities located in the state of New Hampshire [wa]s necessary to ensure that patients and employees of reproductive health care facilities ha[d] unimpeded access to reproductive health care services while accommodating the First Amendment right of people to communicate their message to their intended audience without undue burdens or restrictions.

Aiming to accommodate those interests, the Act provides that "[n]o person shall knowingly enter or remain on a public way or sidewalk" within a buffer zone demarcated by a reproductive health care facility. RSA § 132:38, I. That prohibition does not apply to four classes of persons:

> a)  Persons entering or leaving such facility.
>
> b)  Employees or agents of such facility acting within the scope of their employment for the purpose of providing patient escort services only.
>
> c)  Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment.
>
> d)  Persons using the public sidewalk or the right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

Id. § 132:28, I(a)–(d).  The Act also provides that facilities must first consult with law enforcement[3] and with local authorities with authority over signage "[p]rior to posting the signage . . . to ensure compliance with local ordinances," id. § 132:38, III, and then must "clearly demarcate" any zone they wish to create by means of signage bearing specified language, id. § 132:38, II.  A zone created pursuant to the Act is "effective [only] during the facility's business hours."  Id. § 132:38, IV.

Law enforcement officers may not impose sanctions, which are civil sanctions, for violating the Act "unless the signage authorized in RSA 132:38, II was in place at the time of the alleged violation."  Id. § 132:39, III.  If that precondition is satisfied, an officer is restricted to giving a "written warning" for an individual's first violation of the Act, and then a citation for subsequent violations.  Id. § 132:39, I.  The citation carries with it "a minimum fine of $100," and "the attorney general or the appropriate county attorney may bring an action for injunctive relief to prevent further violations."  Id. § 132:39, II.  The Act also has a severability clause.  Id. § 132:40.

In the past, some of New Hampshire's clinics have resolved or attempted to resolve disputes with protestors by asking

---

[3]    At a motion hearing, the district court recognized, but did not resolve, the ambiguity about what role law enforcement would play.

local police officers to enforce generally applicable local civil ordinances relating to public peace, safety, and crowd control.

B.   McCullen v. Coakley

Sixteen days after Governor Hassan signed the Act into law, the U.S. Supreme Court decided McCullen, and that decision affected the parties in this case. McCullen held unconstitutional a Massachusetts statute that "categorically excluded" most individuals from the area within a fixed 35-foot radius of "any portion of an entrance, exit or driveway of a reproductive health care facility" during the facility's business hours. 134 S. Ct. at 2526. The statute was enforceable both civilly and criminally, with fines, imprisonment, or both. Id.

The Massachusetts statute, the Court said, was a content-neutral time, place, or manner regulation of speech. See id. at 2530-34. The Court applied the test for such regulations, as articulated in Ward v. Rock Against Racism, 491 U.S. 781 (1989), and concluded that the statute was not narrowly tailored, see McCullen, 134 S. Ct. at 2534-40, because it "burden[ed] substantially more speech than [wa]s necessary to further the government's legitimate interests," id. at 2535 (quoting Ward, 491 U.S. at 799). Hence, Massachusetts's statute violated the First Amendment. See id. at 2541.

The Court's narrow tailoring analysis in McCullen placed particular weight on two key factors. First, the Massachusetts

statute created buffer zones of a fixed size, 35 feet, around every abortion clinic in the state, see id. at 2537, 2539, although the record reflected that congestion problems occurred "mainly [in] one place at one time: the Boston Planned Parenthood clinic on Saturday mornings," id. at 2539.  The Court saw a mismatch between the narrowness of the problem and the breadth of the solution.  Second, Massachusetts "ha[d] not shown that it seriously undertook to address the problem [of obstruction and harassment by protestors outside clinics] with less intrusive tools readily available to it."  Id.  "Nor ha[d] it shown that it considered different methods that other jurisdictions ha[d] found effective."  Id.

C.   This Lawsuit

     1.   The Parties

          The complaint alleges that all seven plaintiffs "regularly engage in peaceful prayer, leafleting, sidewalk counseling, pro-life advocacy, and other peaceful expressive activities" outside various reproductive health care facilities in New Hampshire.  It further alleges that the plaintiffs' "sidewalk counseling . . . regularly occurs on areas of the public sidewalks and ways that will be encompassed by buffer zones authorized by the Act," and so they "fear prosecution under the Act" if they continue to engage in expressive activities in those public locations.

Defendant Joseph Foster is the Attorney General of New
Hampshire. The other defendants[4] are the municipalities containing
the clinics at which the plaintiffs wish to continue engaging in
expressive activities, as well as the county attorneys responsible
for enforcing the law in those municipalities. The complaint names
the municipal defendants as parties because they are "authorized
to enforce the Act's buffer zones" in their respective
jurisdictions.[5]

    2. *District Court Proceedings*

On July 7, 2014, soon after the Supreme Court decided
McCullen and three days before the Act was scheduled to take
effect, the plaintiffs initiated this action. Their complaint
seeks to enjoin enforcement of the Act and to have it struck down
as facially unconstitutional under McCullen, as well as
unconstitutional as applied. When the district court lifted its
stay on further proceedings in August 2015, the state Attorney
General moved to dismiss the complaint for lack of standing.

---

[4]    The complaint names the Town of Derry and its county
attorney among the defendants. In the district court, the parties
jointly stipulated that the Planned Parenthood facility in Derry
"does not offer abortion services," and the plaintiffs voluntarily
dismissed those two defendants from the action. Reddy, 2016 WL
1305141, at *3 n.3.

[5]    The "municipal defendants" maintain on appeal that the
complaint fails to state a claim against them. See Fed. R. Civ.
P. 12(b)(6). Because we dismiss on 12(b)(1) grounds, we need not
reach this argument. See Reddy, 2016 WL 1305141, at *13 n.19.

The district court granted the motion to dismiss on March 31, 2016, and then entered judgment and a corrected opinion on April 1, 2016. <u>Reddy</u>, 2016 WL 1305141. The plaintiffs timely appealed.

II.

### Standing and Ripeness

Article III restricts federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. That limitation on "[t]he judicial Power of the United States" is fundamental to the federal judiciary's role within our constitutional separation of powers. <u>Spokeo, Inc.</u> v. <u>Robins</u>, 136 S. Ct. 1540, 1547 (2016) (alteration in original) (quoting U.S. Const. art. III, § 1); <u>see also</u> <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 498 (1975) (discussing "the proper -- and properly limited -- role of the courts in a democratic society"). Two of the limitation's manifestations are the justiciability doctrines of standing and ripeness, which are interrelated; each is rooted in Article III. <u>See</u> <u>Susan B. Anthony List</u> v. <u>Driehaus</u> ("<u>SBA List</u>"), 134 S. Ct. 2334, 2341 n.5 (2014) ("[T]he Article III standing and ripeness issues in this case 'boil down to the same question.'" (quoting <u>MedImmune, Inc.</u> v. <u>Genentech, Inc.</u>, 549 U.S. 118, 128 n.8 (2007))); <u>Warth</u>, 422 U.S. at 499 n.10 (noting the "close affinity" between standing, ripeness, and mootness); <u>see also</u> Richard H. Fallon et al., <u>Hart and Wechsler's The Federal Courts and the Federal System</u>

219-20 (7th ed. 2015) (observing that ripeness "substantially replicate[s] the standing inquiry" in many respects).  This case implicates both doctrines.

A.  Standing

        The "[f]irst and foremost" concern in standing analysis is the requirement that the plaintiff establish an injury in fact, Spokeo, 136 S. Ct. at 1547 (alteration in original) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998)), which "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy,'" SBA List, 134 S. Ct. at 2341 (quoting Warth, 422 U.S. at 498).  To satisfy Article III, the injury "must be 'concrete and particularized' and 'actual or imminent, not "conjectural" or "hypothetical."'"  Id. (quoting Lujan, 504 U.S. at 560).

        In certain circumstances, "the threatened enforcement of a law" may suffice as an "imminent" Article III injury in fact. Id. at 2342.  The rationale for pre-enforcement standing is that a plaintiff should not have to "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."  Steffel v. Thompson, 415 U.S. 452, 459 (1974).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or [if] there is a '"substantial risk" that the harm will occur.'"  SBA List, 134 S. Ct. at 2341 (quoting Clapper, 133

- 13 -

S. Ct. at 1147, 1150 n.5).  But if a future injury is "'too
speculative for Article III purposes' and no prosecution is even
close to impending," then there is no standing to sue.  Blum v.
Holder, 744 F.3d 790, 799 (1st Cir. 2014) (quoting Clapper, 133 S.
Ct. at 1147).

     Because SBA List both postdated and cited Clapper, we
follow its disjunctive framing of the test: injury is imminent if
it is certainly impending or if there is a substantial risk that
harm will occur.  We hold that the plaintiffs have made neither
showing here.  It is their burden to do so.  See Lujan, 504 U.S.
at 561.

B.  Ripeness

     Ripeness, another aspect of justiciability, "has roots
in both the Article III case or controversy requirement and in
prudential considerations." Roman Catholic Bishop of Springfield
v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013) (quoting
Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003)).  Much
as standing doctrine seeks to keep federal courts out of disputes
involving conjectural or hypothetical injuries, the Supreme Court
has reinforced that ripeness doctrine seeks to prevent the
adjudication of claims relating to "contingent future events that
may not occur as anticipated, or indeed may not occur at all."
Texas, 523 U.S. at 300 (quoting Thomas v. Union Carbide Agric.
Prods. Co., 473 U.S. 568, 580–81 (1985)).  "[T]he facts alleged,

under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, No. 15-1906, 2016 WL 7321217, at *4 (1st Cir. Dec. 16, 2016) (quoting MedImmune, 549 U.S. at 127).

Insofar as ripeness is rooted in Article III, we must consider it as part of our assessment of whether we have jurisdiction to hear the lawsuit.[6] See Warth, 422 U.S. at 498. The plaintiffs bear the burden of alleging facts sufficient to demonstrate ripeness. See Labor Relations Div., 2016 WL 7321217, at *5 (citing Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 25 (1st Cir. 2007)). Even a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces. See Texas, 523 U.S. at 301 ("Here, as is often

---

[6]    Under present law, we may also consider the prudential aspects of ripeness "on our own motion," regardless of the parties' wishes. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993); accord Labor Relations Div., 2016 WL 7321217, at *4. In SBA List, the Court cast a measure of doubt upon ripeness's prudential dimensions, observing that prudential justiciability doctrines, including ripeness, are "in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." SBA List, 134 S. Ct. at 2347 (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014)).

true, '[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" (alterations in original) (quoting Int'l Longshoremen's & Warehousemen's Union, Local 37 v. Boyd, 347 U.S. 222, 224 (1954))); Labor Relations Div., 2016 WL 7321217, at *1 (finding a lawsuit seeking "pre-enforcement relief . . . not ripe for adjudication no matter how it is best characterized along the facial/as-applied spectrum").

Ripeness analysis has two prongs: "fitness" and "hardship." See Texas, 523 U.S. at 300-01 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). The fitness prong "has both jurisdictional and prudential components." Roman Catholic Bishop, 724 F.3d at 89. The jurisdictional component of the fitness prong concerns "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." Id. We find that the jurisdictional component has not been satisfied here, independently of any failure to establish the prudential component.

The prudential component of the fitness prong concerns "whether resolution of the dispute should be postponed in the name of 'judicial restraint from unnecessary decision of constitutional issues.'" Id. (quoting Mangual, 317 F.3d at 59). "The hardship

prong . . . is 'wholly prudential,'" id. at 90 (quoting Mangual,
317 F.3d at 59), and "concerns the harm to the parties seeking
relief that would come to those parties from our 'withholding of
a decision' at this time," Labor Relations Div., 2016 WL 7321217,
at *8 (quoting McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 73
(1st Cir. 2003)).  We find that these prudential dimensions of
ripeness also have not been satisfied here.

III.

**Application of Justiciability Doctrines**

Our review of the district court's dismissal is de novo.
See Blum, 744 F.3d at 795.

We agree with the district court that the plaintiffs
lack standing, at this time and on this record, to challenge the
Act.  The record does not contain allegations that the plaintiffs
are currently facing a "certainly impending" injury, nor have the
plaintiffs shown that they face a "substantial risk" of injury.
SBA List, 134 S. Ct. at 2341 (quoting Clapper, 133 S. Ct. at 1150
n.5).

A.  A Precondition to Enforcement Has Not Been Satisfied, and the
    Plaintiffs' Behavior Has Not Been Affected

No buffer zone currently exists, and none has ever
existed in the years since the filing of this lawsuit.  The Act is
not currently preventing the plaintiffs from engaging in

- 17 -

expressive activities in whatever public areas they please.  See RSA § 132:39, III.

The complaint claims only that the plaintiffs "fear prosecution under the Act."  Nowhere does the complaint allege that the demarcation of a zone is imminent or that prosecution will occur without that precondition first having been satisfied. Moreover, the government has affirmatively disavowed prosecution under the Act unless and until a zone is demarcated according to the Act's terms.

The other record materials confirm that the demarcation of a zone is both a precondition to enforcement and an event whose occurrence is speculative at present.   In the plaintiffs' declarations, submitted to the district court in support of their motion for a preliminary injunction, they repeat the complaint's allegation of a "fear [of] prosecution under the Act" if they continue to engage in their customary behavior.  The declarations also allege that the zones, if created, would prohibit expressive activity, "make it substantially more difficult to distribute literature to patients," and "displace [plaintiffs] from positions where [they] engage in sidewalk counseling."  But these alleged injuries are all conditioned on the demarcation of a zone, and the declarations allege no concrete or imminent threat of a clinic choosing to demarcate a zone.   So the threat remains

"hypothetical," given the limited facts before us.  SBA List, 134
S. Ct. at 2341 (quoting Lujan, 504 U.S. at 560).

      The record shows that, after McCullen, reproductive
health care facilities in New Hampshire reevaluated their
potential use of buffer zones.  In her affidavit, dated July 22,
2014, the Concord clinic's director declared that her facility
"has re-evaluated whether to post a buffer [zone] in light of
McCullen" and does "not currently intend to post a buffer zone at
any of the [facility's] entrances."  The Greenland clinic's
director, similarly, stated in her July 21, 2014 affidavit that
her facility

> does not presently intend to post any buffer zone . . . .
> The methods that we have available, and have used in the
> past, have been largely effective in providing a
> reasonably safe environment for our staff and patients.

Indeed, in her March 2015 testimony before a New Hampshire House
committee, a vice president for Planned Parenthood of Northern New
England stated that "in the spirit of the McCullen decision, [she]
would not even suggest . . . post[ing] a zone where there is not
. . . a history of documented attempts to address the balancing of
rights in less restrictive means before considering the option of
posting."

      The district court observed that the Act appears to allow
facilities to demarcate buffer zones "within hours -- if not
minutes -- of any perceived misstep by the plaintiffs."  Reddy,

2016 WL 1305141, at *8. The plaintiffs highlight that fact and argue that, because they have alleged that a zone could be created and enforced within a very short amount of time, they have pled a sufficiently "substantial risk" of injury. SBA List, 134 S. Ct. at 2341. But the fact remains that demarcation is a "contingent future event[] that may not occur as anticipated, or indeed may not occur at all." Texas, 523 U.S. at 300 (quoting Union Carbide, 473 U.S. at 580-81).

The plaintiffs also do not advance their standing argument by contending that the district court should have analogized this case to SBA List rather than to Clapper. In fact, SBA List, like Clapper, confirms that the plaintiffs lack standing.

In SBA List, the Supreme Court recognized the standing of an organization challenging an Ohio statute that proscribed "false statements" about a political candidate during a campaign. 134 S. Ct. at 2338-39. That statute had been on the books for several decades, see Brief of Respondents at 5-6, SBA List, 134 S. Ct. 2334 (No. 13-193), and there was a robust history of its enforcement -- including proceedings involving the very same organization "in a recent election cycle," SBA List, 134 S. Ct. at 2345. Neither of those conditions is present here.

Additionally, in SBA List, the condition precedent to criminal prosecution was an administrative hearing before the Ohio Elections Commission, a proceeding that in itself was burdensome

enough to cause some harm.  See id. at 2345-46.  Indeed, it was "the combination of those two threats" -- Commission proceedings and criminal prosecution -- that the Court found sufficient to establish injury in fact.  Id. at 2346.  By contrast, on this record, demarcation is purely a precondition to harm and not a harm per se.  See RSA § 132:39, III.  That distinction makes the "chain of possibilities" leading to a future cognizable injury, Clapper, 133 S. Ct. at 1148, significantly more attenuated here than it was in SBA List.

Further, neither the complaint nor any of the plaintiffs' declarations alleges that the Act, as of yet, has forced any sidewalk counselor or protestor to refrain from any expressive activities.  To the contrary, several of the plaintiffs' declarations acknowledge that "the Act has not yet impacted [their] activities."  Another plaintiff's declaration asserts that "[b]eing moved beyond the driveway zone at the Greenland abortion facility would impair [her] message because it would make it harder for women driving into the facility to see [her] banner."  But nowhere does she allege that she has ever actually been forced to stand farther away from the clinic than she would like.  Nor does any other plaintiff allege that harm, or any other present harm.

The plaintiffs do allege that they "fear prosecution under the Act if they continue to" engage in expressive activities in the public areas where zones may someday be created.  But a

plaintiff's conjectural fear that a government actor "might in the future take some other and additional action detrimental to" her does not suffice to create standing.  Clapper, 133 S. Ct. at 1152 (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)).  Speculation of that sort amounts to "a subjective chill" -- which, in the Article III standing context, is "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  Id. (quoting Laird, 408 U.S. at 13-14).

B.    The Plaintiffs Have Not Alleged Any Injury Arising from the Act's Delegation of Authority to Private Parties

The fact that the Act delegates zone-drawing authority to private facilities also fails to confer pre-enforcement standing.

The plaintiffs attempt to sharpen their argument for standing along two lines.  The first is that this case should, as a matter of law, be treated like Van Wagner, a licensing case. That analogy is inapt, as we explain below.  Plaintiffs' second line is a factual theory that a clinic could use its authority to demarcate buffer zones to coerce the plaintiffs into changing, or refraining from, certain behavior.  We need not decide whether this theory of First Amendment injury could ever be actionable, because the record is clear that there is no allegation that any clinic has done any such thing.

- 22 -

Van Wagner recognized that plaintiffs had pre-enforcement standing in their facial challenge to a regulatory scheme in Massachusetts, which required "parties wishing to engage in outdoor [billboard] advertising to obtain a license in advance" from a state agency.  Van Wagner, 770 F.3d at 35.  The scheme granted "sole discretion" to the agency's director to issue such licenses.  Id.  In recognizing standing in Van Wagner, this court stated that "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."  Id. at 40 (alteration in original) (emphasis omitted) (quoting City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 757 (1988)).  The plaintiffs, seizing on that language, argue that the Act's delegation of zone-drawing authority confers pre-enforcement standing in itself, as a matter of law, without any requirement that the authority actually be exercised.

The analogy to Van Wagner fails.  The Act does not require the plaintiffs to obtain any sort of license before engaging in speech.  Simply put, there literally is no prior restraint here imposed; there is only a delegation of the power to impose a restriction on speech, via demarcation of a zone, at some point in the future.  The plaintiffs cite no case justifying their "novel theory" that the Act is a prior restraint, Reddy, 2016 WL

1305141, at *10, and we conclude that this is not a prior restraint case as a matter of law.[7]

The plaintiffs also offer a fact-based theory: the clinics could influence or curtail the plaintiffs' activities by threatening to demarcate a zone. At oral argument, plaintiffs' counsel asserted that "the threat to draw zones is what chills [his] clients' speech."

But the record contains no allegations that this fear of coercion is anything more than conjecture. The Greenland clinic director's affidavit, to which counsel directed us at oral argument when asked for his support on this point, states that "having the option of creating a buffer if other methods fail . . . would be helpful when negotiating about unsafe behaviors of the demonstrators." In the same affidavit, however, the director states that her clinic "does not presently intend to post any buffer zone" and that "[t]he methods that [the clinic] ha[s] available, and ha[s] used in the past, have been largely effective

---

[7]     First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114 (10th Cir. 2002), also fails to support plaintiffs' theory. First Unitarian did not establish any sort of special analysis for the delegation of speech-restricting authority to private parties, but rather held that Salt Lake City "could not ameliorate [its unconstitutional speech prohibition] by delegating its power to enforce that prohibition to a third party." Reddy, 2016 WL 1305141, at *11 (citing First Unitarian, 308 F.3d at 1132).

in providing a reasonably safe environment for [its] staff and patients."

Similarly, the Greenland clinic director testified that "[t]he threat of having [the Act] enforced . . . did make people behave in a better way and we've been able to work with that. . . . I think it's already doing some good." That statement does not suggest that the clinic has engaged in any form of persuasion, much less coercion, to alter the plaintiffs' behavior. The complaint and declarations do not allege that the Greenland clinic has ever actually used its ability to engage in zone-drawing[8] as a weapon to infringe the First Amendment interests of these plaintiffs -- or indeed of any individuals wishing to express themselves.

C.   The Dispute Is Not Presently Ripe for Adjudication

In light of our finding on the lack of plausible allegations of chill from the statute's mere existence, there remains only the challenge predicated on the possible future implementation of a zone. But the possible establishment and contours of such a future zone are highly uncertain. "[W]e have no idea whether or when" a clinic will demarcate a zone. Texas, 523 U.S. at 300 (quoting Toilet Goods Ass'n, Inc. v. Gardner, 387

---

[8]    The record does not show that the Greenland clinic has ever taken the steps of consulting with law enforcement or local authorities with authority over signage, making the argument that it will then use its zone-drawing ability ever more attenuated.

U.S. 158, 163 (1967)).  That observation sounds in the analysis of both standing and ripeness.

Both components of ripeness's fitness prong point toward a lack of ripeness in this case.  If the dispute were to develop into a case or controversy fit for adjudication, it would be at some future time when the Act is causing cognizable harm -- to particular plaintiffs, at a particular clinic, and under particular circumstances.  Until then, a federal court could not meaningfully adjudicate a case, nor could it, if the facts warranted relief, frame redress through injunctive or declaratory relief.  Until the dispute ripens, and more facts come to light, we "cannot perform the requisite claim-specific . . . analysis as to any claim that may be brought, as we have before us only hypothetical . . . claims, the details of which are not known." Labor Relations Div., 2016 WL 7321217, at *6; see also id. at *7 (finding lawsuit unripe because "no . . . claim-specific inquiry c[ould] be made" (citing McInnis-Misenor, 319 F.3d at 72)).

With respect to ripeness's hardship prong, there is no apparent prejudice to the plaintiffs if they must wait until their claims ripen to sue.  They are "not required to engage in, or to refrain from, any conduct, unless and until" a facility demarcates a zone.  Texas, 523 U.S. at 301; see also Labor Relations Div., 2016 WL 7321217, at *8 (finding little to no hardship in delaying

- 26 -

adjudication because of the contingent nature of the claimed injury).

"In sum, we find it too speculative whether the problem [the plaintiffs] present[] will ever need solving."  Texas, 523 U.S. at 302.

## IV.

### Conclusion

We affirm the district court's dismissal of the action for want of jurisdiction.  The dismissal is without prejudice. See Hochendoner v. Genzyme Corp., 823 F.3d 724, 736 (1st Cir. 2016).